**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED

JUN 29 2017

U.S. COURT OF
FEDERAL CLAIMS

IDEAL INNOVATIONS, INC.,

THE RIGHT PROBLEM, LLC, and

ROBERT KOCHER,

          Plaintiffs,

    v.

THE UNITED STATES OF AMERICA,

          Defendant.

Case No.  **17-889 C**

Judge  _____

## COMPLAINT

Plaintiffs Ideal Innovations, Inc. ("I-3"), The Right Problem, LLC ("TRP"), and Robert

Kocher (collectively, "Plaintiffs"), by and through their attorneys, present claims for relief against

the United States of America (the "Government") and state as follows:

## NATURE OF THE ACTION

1.      This action arises, *inter alia*, under the laws of the United States, Title 35 of the

United States Code, § 1 *et seq.* for patent infringement, and under the Fifth Amendment of the

U.S. Constitution for the uncompensated taking of property.

## PARTIES

2.      Plaintiff Ideal Innovations, Inc. is a corporation organized and existing under the

laws of the Commonwealth of Virginia, with its principal place of business at 950 North Glebe

Road, Suite 800, Arlington, Virginia 22203.

3.      Plaintiff The Right Problem, LLC is a corporation organized and existing under the

laws of the Commonwealth of Virginia, with its principal place of business at 950 North Glebe

Road, Suite 800, Arlington, Virginia 22203.

4.     Plaintiff Robert Kocher is the President and CEO of both The Right Problem, LLC, and Ideal Innovations, Inc.  Mr. Kocher's address is 1880 Virginia Avenue, McLean, Virginia 22101.

5.     Defendant is the Government, acting through its various authorized agencies and personnel, including, but not limited to, the United States Department of the Navy – Marine Corps and the United States Department of Defense.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1491 and 1498.

7.     28 U.S.C. § 1491 provides, in relevant part, as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.  . . .

28 U.S.C. § 1491(a)(1).

8.     28 U.S.C. § 1498(a) further provides, in relevant part, as follows:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.  . . .

For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor . . . for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a).

## THE PATENTS-IN-SUIT

9.     On July 22, 2008, United States Patent No. 7,401,540 ("the '540 Patent"),[1] entitled "Highly Survivable Urban Utility Vehicle (HSUUV)," was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Serial No. 11/507,089, filed on August 21, 2006.  TRP is the owner, by valid assignment, of the entire right, title and interest in and to the '540 Patent, including the right to assert all causes of action arising under the patent and the right to any remedies for infringement of the patent.

10.     On February 5, 2013, United States Patent No. 8,365,648 ("the '648 Patent"),[2] entitled "Highly Survivable Urban Utility Vehicle (HSUUV)" was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Serial No. 12/153,269, filed on May 15, 2008.  TRP is the owner, by valid assignment, of the entire right, title and interest in and to the '648 Patent, including the right to assert all causes of action arising under the patent and the right to any remedies for infringement of the patent.

11.     On February 18, 2014, United States Patent No. 8,651,008 ("the '008 Patent"),[3] entitled "Highly Survivable Urban Utility Vehicle (HSUUV)," was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Serial No. 13/727,308, filed on December 26, 2012.  TRP is the owner, by valid assignment, of the entire right, title and interest in and to the '008 Patent, including the right to assert all causes of action arising under the patent and the right to any remedies for infringement of the patent.

12.     Each of the '540 Patent, '648 Patent, and '008 Patent relate generally to a novel armored vehicle system that allows a wheeled vehicle to be both well-protected and highly mobile.

_____
[1] Attached hereto as Exhibit A.
[2] Attached hereto as Exhibit B.
[3] Attached hereto as Exhibit C.

The patents disclose configurations of heavy armor on certain portions of the vehicle's crew cab, and light armor on other portions of the vehicle's crew cab. Instead of protecting the interior of the vehicle with relatively thin armor applied evenly around its exterior, in one configuration, heavy armor is designed to protect the driver and passengers of the vehicle from a side attack. If heavy armor was disposed on all sides, top, and bottom of the crew cab, the vehicle would exceed its maximum weight and be rendered not useful.

## BACKGROUND

13.     In 2005, tens of thousands of U.S. troops were deployed abroad as part of Operation Enduring Freedom and Operation Iraqi Freedom. U.S. troops in Iraq and Afghanistan traveling in wheeled vehicles suffered high levels of casualties due to Explosively-Formed Penetrators ("EFPs")—a different and deadlier threat than traditional Improvised Explosive Devices ("IEDs").

14.     EFPs are designed to pierce armor—such as the armor on vehicles carrying U.S. troops—from long distances. In EFPs, a curved copper disk is positioned in a metal tube filled with explosives. Upon detonation, the disk deforms into a rod. This rod travels at an extremely high rate of speed (greater than one mile per second) towards the target, such as the side of an American vehicle. EFPs can penetrate over 8 inches of hardened steel armor. In 2005, attacks from EFP munitions had very low survivability.

15.     In or around 2005, most armored wheeled vehicles, such as High-Mobility, Multi-Purpose Wheeled Vehicles ("HMMWVs"), utilized armor that was evenly distributed around the exterior of the vehicle. Although this armoring scheme provided some degree of protection against all angles of attack, it failed to provide sufficient protection against the threat posed by EFPs. Adding enough armor to withstand the EFP threat was thought to be impractical due to the weight of the additional armor. Accordingly, many were skeptical that wheeled vehicles, especially

commercially available vehicles, could be armored in a reasonable manner that would allow crews to survive EFP attacks.

16.     After learning of the new and lethal threat to U.S. troops posed by EFPs, Robert Kocher, inventor of all three patents-in-suit, decided to apply his knowledge and experience to developing a novel armor system for personnel-carrying vehicles in Iraq and Afghanistan.  Mr. Kocher is a 1976 graduate of the United States Military Academy, and he served in the Army in a variety of management and leadership roles from 1976 through 1997.  Mr. Kocher has also served as a Program Manager for the Defense Advanced Research Projects Agency ("DARPA"), where he was responsible for the evaluation, selection and transitioning of high-concept technologies for military applications in peacekeeping and future combat operations.

17.     Mr. Kocher invented a novel armoring solution that provides wheeled vehicles with protection from EFP munitions while maintaining their mobility and reasonable cost.  Instead of applying armor uniformly around the exterior of the vehicle as was done with HMMWVs, Mr. Kocher's design involved replacing the standard doors of a wheeled vehicle with extremely thick side armor.  The front and rear of the vehicle could still be armored, but substantially less so, and the bottom of the vehicle could be outfitted with under armor.

18.     Thus, Mr. Kocher's design provides very heavy armor in the areas most likely to be attacked: the sides of the vehicle.  Lighter armor is used elsewhere, which allows armored vehicles to retain their speed and mobility.

19.     On January 20, 2006, Mr. Kocher, through his company Ideal Innovations, Inc. ("I-3"), provided a briefing to the U.S. Army's Rapid Equipping Force ("REF") detailing a commercially available vehicle equipped with his invention.  This briefing was prominently labeled as containing proprietary information and, in fact, contained proprietary, trade secret

information, including the technical characteristics and specifications of prototypes equipped with Mr. Kocher's armor system, the specific materials used in I-3's prototype implementation of the armor system, and implementation details (including photographs) showing how a commercially available vehicle can be transformed into an EFP-resistant vehicle. The proprietary, trade secret information also included itemized cost savings over other military vehicles that Mr. Kocher's invention would enable. REF then submitted Mr. Kocher's proposal to U.S. Army Tank Automotive Command ("TACOM").

20. On February 3, 2006, TACOM responded to I-3's proposal: TACOM, being the government's subject matter expert for vehicle armoring, issued a skeptical professional assessment of Mr. Kocher's proposal, and the REF Director decided not to pursue Mr. Kocher's proposal.

21. On June 24, 2006, since U.S. military casualties from EFPs in Iraq continued to mount on a weekly basis and the existing vehicles in use in Iraq and Afghanistan were extremely vulnerable to EFPs, I-3 again presented the information from the January 20, 2006 briefing to the REF for prototype vehicles employing Mr. Kocher's invention, again prominently labeling the briefing as containing proprietary information.

22. In July 2006, REF agreed to run tests against sample armor kits pursuant to Mr. Kocher's invention, shooting these armor kits with EFP munitions. Mr. Kocher funded these tests himself. The tests, to the Government's surprise, were successful: Mr. Kocher's armor kits withstood the EFP munitions.

23. On August 21, 2006, as described above, Mr. Kocher filed U.S. Patent Application Serial No. 11/507,089, which later issued as the '540 Patent.

24.    On August 28, 2006, the Army Contracting Agency awarded I-3 with a purchase order for two prototype vehicles equipped with Mr. Kocher's novel armor system.

25.    From March 5-19, 2007, I-3 prototype vehicles were tested at the Aberdeen Proving Ground. To the Government's astonishment, the prototype vehicles exhibited unmatched superior armor characteristics: EFPs could not penetrate the sides of the vehicles, and the armor system was light enough such that the vehicles maintained a high degree of mobility.

26.    On April 16, 2007, I-3, as a small business, submitted an unsolicited proposal, prominently labeled as containing proprietary information, for vehicles employing Mr. Kocher's invention to TACOM. On May 23, 2007, I-3, as a small business, also submitted an unsolicited proposal, again prominently labeled as containing proprietary information for vehicles employing Mr. Kocher's invention to the Marine Corps Systems Command ("MARCORSYSCOM").

27.    Both of these proposals contained proprietary, trade secret information, including the technical characteristics and specifications of prototypes equipped with Mr. Kocher's armor system, the specific materials used in I-3's prototype implementation of the armor system, and implementation details (including photographs) showing how a commercially available vehicle can be transformed into an EFP-resistant vehicle. The proprietary, trade secret information also included itemized cost savings over other military vehicles that Mr. Kocher's invention would enable. Both of these proposals, in addition to being labeled as containing proprietary information, also clearly stated that they were "to be used only for evaluation purposes." Hereinafter, the proprietary information submitted to the Government by I-3, discussed, above will be referred to as "I-3 Proprietary Information."

28.    The April 16, 2007 submission prominently also included the following statement:

This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed—in whole or in part—for any purpose

other than to evaluate this proposal. However, if a contract is awarded to this offeror as a result of or in connection with the submission of these data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in these data if they are obtained from another source without restriction.

29.    Also, the May 23, 2007 submission prominently included the following statement:

This submission is subject to the provisions of FAR Subpart 15.6 - Unsolicited Proposals. It includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate this proposal. However, if a contract is awarded to this offeror as a result of or in connection with the submission of these data, then the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in these data if they are obtained from another source without restriction.

30.    On May 29, 2007, former Senator Biden sent a letter to the Secretary of Defense at the time, Robert Gates, citing an I-3 vehicle equipped with Mr. Kocher's invention (the "Bull") as a potential solution to the threat posed by EFPs.

31.    Less than two weeks later, on June 12, 2007, Stars & Stripes, an American military newspaper, published an article noting that the Bull was capable of defeating EFP munitions.

32.    On June 15, 2007, MARCORSYSCOM rejected I-3's May 23, 2007 proposal on the basis that it was determined not to be a valid unsolicited proposal under FAR 15.603(c)(6) in that it addressed a previously published agency requirement for MRAP vehicles.  I-3 responded on June 18, 2007, requesting the referenced requirement and asking MARCORSYSCOM to withdraw its objection and consider the merits of I-3's proposal to protect the lives of American soldiers.  To date, I-3 has not received the requested information.

33.    On July 31, 2007, MARCORSYSCOM issued a request for proposal for a heavy vehicle program known as "MRAP-II" to address the threat of EFPs.[4]  Additionally, in order to

---

[4] "MRAP" stands for "Mine Resistant Ambush Protected."

equip MRAP vehicles already in service with protection against EFPs, the United States Marine Corps ("USMC") initiated the MRAP Expedient Armor Program ("MEAP") program.

34.     On December 18, 2007, MRAP-II awards were issued to I-3 and to BAE Systems. Additionally, over $2 Billion of contracts was awarded to pre-existing MRAP vendors to up-armor vehicles already in service pursuant to the MEAP program.  Under the MEAP program, applique armor kits were installed on thousands of armored vehicles built during Operation Enduring Freedom and Operation Iraqi Freedom.

35.     Despite I-3's MRAP-II award, only six test vehicles were ever ordered from I-3.  I-3 briefed members of Congress and their staff on this fact on February 4, 2008.  On April 21, 2008, I-3 briefed MARCORSYSCOM accordingly.  I-3 also briefed TACOM on April 30, 2008.

36.     On information and belief, rather than place orders with I-3 to provide Mr. Kocher's novel armor system to new MRAP-II and existing MRAP vehicles (through up-armor MEAP kits), the USMC awarded contracts for EFP-resistant vehicles and up-armor kits to I-3's competitors.

37.     On information and belief, the USMC, via the authorized actions of Government personnel, unlawfully provided I-3's competitors with I-3 Proprietary Information relating to the implementation of Mr. Kocher's novel design, as well as his patented inventions.  Because, among other things, the relevant communications between USMC and these competitors are classified, the injury to Plaintiffs from the Government's unlawful actions has not been readily discoverable, and Plaintiffs were, and remain, unable to specifically identify the information, including the I-3 Proprietary Information and Plaintiffs' patented inventions that were unlawfully provided by the USMC to these competitors or other entities.  However, upon information and belief, the nature and extent of the USMC's unlawful taking and use of I-3 Proprietary Information stabilized not

earlier than on or about October 1, 2012, when the MRAP program was reported to be completed, while use of vehicles manufactured under the MRAP program has continued.

38.     In December of 2008, Mr. Kocher and Lieutenant General (Ret.) Roy Beauchamp, a member of I-3's advisory board, met with the Commander of the Marine Corps System Command, Brigadier General Michael Brogan.  During this meeting Mr. Kocher discussed the '540 Patent, which had issued earlier that year, and its applicability to MRAP vehicles that were up-armored with MEAP kits.  Commander Brogan stated at this meeting that his lawyers had already reviewed the patent.  Over the years, Plaintiffs have continued to seek information from the Government regarding possible use of I-3 Proprietary Information and/or Plaintiff's patented technology, including via verbal requests and submission of a FOIA request.  To date, these efforts have not been fruitful.

39.     In 2011, I-3 assigned all of its right, title, and interest to the '540 Patent to another of Mr. Kocher's companies: The Right Problem, LLC.  The '648 Patent and '008 Patent were duly assigned to TRP after those patents issued.

40.     On July 28, 2014, TRP sent the Department of the Navy an administrative claim letter for patent infringement pursuant to Defense Federal Acquisition Regulation Supplement ("DFARS") 227.7002, explaining that the MRAP vehicles integrated with MEAP kits made by, used by, and/or manufactured by or for the Government, infringe the patents-in-suit.  The letter also set forth TRP's belief that vehicles procured under the MRAP-II vehicle program infringe the patents-in-suit.

41.     On January 31, 2017, the Department of the Navy responded to TRP's administrative claim letter with a denial.

## COUNT I: INFRINGEMENT OF THE '540 PATENT

42. Plaintiffs hereby incorporate by reference their allegations contained in paragraphs 1 through 41 of this Complaint as though fully set forth herein.

43. On information and belief, the Government has infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '540 Patent pursuant to 35 U.S.C. § 271(a) by making, using, and/or having had manufactured, without license or lawful right, vehicles such as the Navistar International MaxxPro Plus Vehicle ("MaxxPro"). Plaintiffs have been damaged by the Government's infringement in an amount not less than $50,000,000.

44. For example, on information and belief, the MaxxPro, made by, used by, and/or manufactured by or for the Government, infringes claim 1 of the '540 Patent; this claim recites:

> A wheeled vehicle comprising: truck mobility components configured to transport the weight of an armored crew compartment, cargo, and additional armor with a gross vehicle weight from 10,000 to 100,000 pounds; said armored crew compartment constructed from armor material comprising a front, back and two lateral sides, configured with sufficient armor material to provide protection from explosive munitions fragments on said armored crew compartment front, back, top and bottom; vehicle armor protection on the bottom of the vehicle configured and sufficient to protect against mines and improvised explosive devices (IEDs) in and near the road; side armor located on said lateral sides comprising a mass configured to defeat explosive munitions including improvised explosive devices (IEDs) and armor piercing projectiles; a thickness ratio greater than five of said side armor to either the front or back armor of the said armored crew compartment; a weight ratio in pounds per square foot greater than three of said side armor to either the front or back armor of the said armored crew compartment; said side armor with mass ranging from 60 to 250 pounds per square foot; and, said side armor with a thickness from 8 to 24 inches thick.

45. On information and belief, the MaxxPro is a wheeled vehicle. On information and belief, it includes truck mobility components configured to transport the weight of an armored crew compartment, cargo, and additional armor with a gross vehicle weight from 10,000 to 100,000 pounds. As set forth in the MaxxPro spec sheet,[5] the MaxxPro comprises wheels and

---

[5] Hereinafter, the "MaxxPro Spec Sheet."

suspension components, seats a "2-man crew plus 4-6 passengers and gunner," and is "designed to accept additional add-on armor." It has a curb weight of "38,900" pounds. *Id.*

46. On information and belief, the MaxxPro's armored crew compartment is constructed from armor material comprising a front, back and two lateral sides.

47. On information and belief, the armored crew compartment is configured with sufficient armor material to provide protection from explosive munitions fragments on said armored crew compartment front, back, top and bottom. On information and belief, the MaxxPro also comprises vehicle armor protection on the bottom of the vehicle configured and sufficient to protect against mines and improvised explosive devices (IEDs) in and near the road. For example, the MaxxPro Spec Sheet notes that the MaxxPro comprises "Ballistic protection: armor and glass protection to meet mission needs" and a "specialized 'V'-shaped hull design [that] protects against mine/IED blasts."

48. On information and belief, the MaxxPro can comprise side armor located on said lateral sides comprising a mass configured to defeat explosive munitions including improvised explosive devices (IEDs) and armor piercing projectiles. For example, the MaxxPro Spec Sheet notes that the MaxxPro is "EPP capable and ready" and "is designed to accept additional add-on armor as mission requirements warrant."

49. On information and belief, the MaxxPro with add-on armor comprises a thickness ratio greater than five of said side armor to either the front or back armor of the said armored crew compartment, and a weight ratio in pounds per square foot greater than three of said side armor to either the front or back armor of the said armored crew compartment.

50.     On information and belief, the MaxxPro with add-on armor comprises said side armor with mass ranging from 60 to 250 pounds per square foot with a thickness from 8 to 24 inches thick.

51.     The description of the MaxxPro vehicle herein is provided for exemplary purposes.

52.     On information and belief, USMC procurements having PIIDs M678540705023, M678540705024, M678540705025, M678540705026, M678540705027, M678540705028, M678540705029, M678540705030, M678540705031, M678540705032, and M678540705033, as well as U.S. Army procurements for the U.S. Army's Medium Mine Protected Vehicle program, all constitute infringing activity.

53.     On information and belief, the USMC procurement having PIID M6785408D5001 also constitutes infringing activity because, on information and belief, it was under this contract that MRAP-II vehicles were procured.

54.     On information and belief, Defendant has committed the foregoing infringing activities without license from TRP or any other Plaintiff.

55.     Defendant has infringed, and continues to infringe, one or more claims of the '540 Patent by making, using, and/or having manufactured, without license or lawful right, the invention taught by this patent.

56.     TRP is the assignee and sole owner, and has standing to sue for infringement, of the '540 Patent.

57.     TRP is entitled to recover from the United States its reasonable and entire compensation for such infringing use.

## COUNT II: INFRINGEMENT OF THE '648 PATENT

58.     Plaintiffs hereby incorporate by reference their allegations contained in paragraphs 1 through 57 of this Complaint as though fully set forth herein.

13

59.     On information and belief, the Government has infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '648 Patent pursuant to 35 U.S.C. § 271(a) by making, using, and/or having had manufactured, without license or lawful right, vehicles such as the MaxxPro.  Plaintiffs have been damaged by the Government's infringement in an amount not less than $50,000,000.

60.     For example, on information and belief, the MaxxPro, made by, used by, and/or manufactured by or for the Government, infringes claim 1 of the '648 Patent; this claim recites:

> A wheeled armored vehicle system, comprising: a wheeled vehicle having a cab, the cab having two sides, a top, a front, a rear, and a bottom, the cab being a central portion of the vehicle for substantially surrounding one or more passengers; heavy armor disposed on select areas of the vehicle including at least portions of the two sides of the cab; and light armor disposed on select areas of the vehicle including select areas of the cab.

61.     On information and belief, the MaxxPro is a wheeled armored vehicle system.  On information and belief, it comprises a wheeled vehicle having a cab.  As set forth in the MaxxPro Spec Sheet, the MaxxPro comprises wheels and suspension components, seats a "2-man crew plus 4-6 passengers and gunner," and is "designed to accept additional add-on armor."

62.     On information and belief, the MaxxPro's cab has two sides, a top, a front, a rear, and a bottom, and the cab is a central portion of the vehicle for substantially surrounding one or more passengers.[6]

63.     On information and belief, the MaxxPro can comprise heavy armor disposed on select areas of the vehicle including at least portions of the two sides of the cab.  For example, the MaxxPro Spec Sheet notes that the MaxxPro is "EPP capable and ready" and "is designed to accept additional add-on armor as mission requirements warrant."

---

[6] As set forth in the MaxxPro Spec Sheet, the MaxxPro seats a "2-man crew plus 4-6 passengers and gunner."

64.     On information and belief, the MaxxPro can comprise light armor disposed on select areas of the vehicle including select areas of the cab.  For example, the MaxxPro Spec Sheet states that the MaxxPro can comprise "Ballistic protection: armor and glass protection to meet missile needs."

65.     The description of the MaxxPro vehicle herein is provided for exemplary purposes.

66.     On information and belief, USMC procurements having PIIDs M678540705023, M678540705024, M678540705025, M678540705026, M678540705027, M678540705028, M678540705029, M678540705030, M678540705031, M678540705032, and M678540705033, as well as U.S. Army procurements for the U.S. Army's Medium Mine Protected Vehicle program, all constitute infringing activity.

67.     On information and belief, the USMC procurement having PIID M6785408D5001 also constitutes infringing activity because, on information and belief, it was under this contract that MRAP-II vehicles were procured.

68.     On information and belief, Defendant has committed the foregoing infringing activities without license from TRP or any other Plaintiff.

69.     Defendant has infringed, and continues to infringe, one or more claims of the '648 Patent by making, using, and/or having manufactured, without license or lawful right, the invention taught by this patent.

70.     TRP is the assignee and sole owner, and has standing to sue for infringement, of the '648 Patent.

71.     TRP is entitled to recover from the United States its reasonable and entire compensation for such infringing use.

## COUNT III: INFRINGEMENT OF THE '008 PATENT

72.     Plaintiffs hereby incorporate by reference their allegations contained in paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73.     On information and belief, the Government has infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '008 Patent pursuant to 35 U.S.C. § 271(a) by making, using, and/or having had manufactured, without license or lawful right, vehicles such as the MaxxPro.  Plaintiffs have been damaged by the Government's infringement in an amount not less than $50,000,000.

74.     For example, on information and belief, the MaxxPro, made by, used by, and/or manufactured by or for the Government, infringes claim 3 of the '008 Patent; this claim recites:

> A wheeled armored vehicle system, comprising: a wheeled vehicle having a cab, the cab having two sides, the cab being a central portion of the vehicle for substantially surrounding one or more passengers; relatively thick armor sufficient to withstand assault with one or more specific types of munitions disposed on select areas of the vehicle including at least portions of the two sides of the cab; and relatively thin armor insufficient to withstand assault with the specific types of munitions disposed on select areas of the vehicle including one or more other areas of the cab, wherein the relatively thick armor is of sufficient weight that if relatively thick armor were disposed on the other areas of the cab, the wheeled vehicle would exceed its maximum weight and be rendered not useful.

75.     On information and belief, the MaxxPro is a wheeled armored vehicle system.  On information and belief, it comprises a wheeled vehicle having a cab.  As set forth in the MaxxPro Spec Sheet, the MaxxPro comprises wheels and suspension components, seats a "2-man crew plus 4-6 passengers and gunner," and is "designed to accept additional add-on armor."

76.     On information and belief, the MaxxPro's cab has two sides, and the cab is a central portion of the vehicle for substantially surrounding one or more passengers.[7]

---

[7] As set forth in the MaxxPro Spec Sheet, the MaxxPro seats a "2-man crew plus 4-6 passengers and gunner."

77.     On information and belief, the MaxxPro can comprise relatively thick armor sufficient to withstand assault with one or more specific types of munitions disposed on select areas of the vehicle including at least portions of the two sides of the cab.  For example, the MaxxPro Spec Sheet notes that the MaxxPro is "EPP capable and ready" and "is designed to accept additional add-on armor as mission requirements warrant."

78.     On information and belief, the MaxxPro can comprise relatively thin armor insufficient to withstand assault with the specific types of munitions disposed on select areas of the vehicle including one or more other areas of the cab.  For example, the MaxxPro Spec Sheet states that the MaxxPro can comprise "Ballistic protection: armor and glass protection to meet missile needs."

79.     On information and belief, the relatively thick armor the MaxxPro can comprise is of sufficient weight that if relatively thick armor were disposed on the other areas of the cab, the wheeled vehicle would exceed its maximum weight and be rendered not useful.

80.     The description of the MaxxPro vehicle herein is provided for exemplary purposes.

81.     On information and belief, USMC procurements having PIIDs M678540705023, M678540705024, M678540705025, M678540705026, M678540705027, M678540705028, M678540705029, M678540705030, M678540705031, M678540705032, and M678540705033, as well as U.S. Army procurements for the U.S. Army's Medium Mine Protected Vehicle program, all constitute infringing activity.

82.     On information and belief, the USMC procurement having PIID M6785408D5001 also constitutes infringing activity because, on information and belief, it was under this contract that MRAP-II vehicles were procured.

83.     On information and belief, Defendant has committed the foregoing infringing activities without license from TRP or any other Plaintiff.

84.     Defendant has infringed, and continues to infringe, one or more claims of the '008 Patent by making, using, and/or having manufactured, without license or lawful right, the invention taught by this patent.

85.     TRP is the assignee and sole owner, and has standing to sue for infringement, of the '008 Patent.

86.     TRP is entitled to recover from the United States its reasonable and entire compensation for such infringing use.

## COUNT IV: TAKING UNDER THE FIFTH AMENDMENT

87.     Plaintiffs hereby incorporate by reference their allegations contained in paragraphs 1 through 41 of this Complaint as though fully set forth herein.

88.     The Fifth Amendment provides that private property cannot "be taken for public use without just compensation."  U.S. Const. Amend V.

89.     Plaintiffs possessed cognizable property rights in the protectable trade secrets that they own, referred to above as I-3 Proprietary Information.  At all times, the aforementioned I-3 Proprietary Information disclosed to the Government was kept secret by I-3.  I-3 employs industry-standard measures to safeguard the secrecy of proprietary I-3 information, including the I-3 Proprietary Information discussed above.

90.     Additionally, the I-3 Proprietary Information had significant economic value, including to I-3's competitors.  This information was the product of a significant expenditure of Plaintiffs' time and resources.

91.     Upon information and belief, as alleged above, the Government took the I-3 Proprietary Information and, via duly authorized actions of Government personnel, provided it to others, including I-3's competitors without payment of just compensation to Plaintiffs.

92.     The submissions of the I-3 Proprietary Information to the Government were prominently labeled, *inter alia*, as containing "Proprietary Information".

93.     The Government did not have Plaintiffs' express or implied consent to appropriate, disclose, or use the I-3 Proprietary Information apart from evaluating I-3's proposals.

94.     The Government, at the time of the apparent disclosures, knew or should have known that its knowledge of the I-3 Proprietary Information was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

95.     As a direct and proximate result of the Government's taking of the I-3 Proprietary Information without compensation, Plaintiffs have suffered monetary damages of not less than $100,000.

### COUNT V: BREACH OF IMPLIED-IN-FACT CONTRACT

96.     Plaintiffs hereby incorporate by reference their allegations contained in paragraphs 1 through 41, and 87 through 95, of this Complaint as though fully set forth herein.

97.     The Government by, *inter alia*, promulgation of regulations (*e.g.*, 48 C.F.R. 15.600 *et seq.*) extended to Plaintiffs an open offer to contract. This implied-in-fact contract included a promise to maintain confidentiality of proprietary data in exchange for submission of "Unsolicited Proposals." Plaintiffs accepted that offer and consideration was provided by Plaintiffs' submissions to the Government, identified above, that contained I-3 Proprietary Information and that complied with the terms of the applicable regulations.

98.     Upon information and belief, the Government breached this implied-in-fact contract by, *inter alia*, disclosing via authorized government action the I-3 Proprietary Information

to others, including I-3's competitors. The Government, upon information and belief, also breached an implied covenant of good faith and fair dealing that arose along with the implied-in-fact contract.

99.     As a direct and proximate result of the Government's breach of this implied-in-fact contract, Plaintiffs have suffered monetary damages in an amount not less than $100,000.

## COUNT VI: MISAPPROPRIATION OF TRADE SECRET

100.    Plaintiffs hereby incorporate by reference their allegations contained in paragraphs 1 through 41, and 87 through 99, of this Complaint as though fully set forth herein.

101.    This claim for misappropriation of trade secrets involves Government action arising out of and related to the aforementioned implied-in-fact contract between Plaintiffs and the Government.

102.    Upon information and belief, as alleged above, and in violation of its agreement with Plaintiffs, the Government took the I-3 Proprietary Information and, via duly authorized actions of Government personnel, provided it to others, including I-3's competitors without payment of just compensation to Plaintiffs.

103.    As a direct and proximate result of the Government's misappropriation of trade secrets, Plaintiffs have suffered monetary damages in an amount not less than $100,000.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this honorable Court enter an order providing the following relief:

A.  Enter judgment in Plaintiffs' favor on all Counts set forth in this Complaint;

B. Entry of judgment that the United States has used and/or had manufactured the invention described in and covered by U.S. Patent No. 7,401,540 without license or lawful right within the meaning of 28 U.S.C. § 1498 such that Plaintiffs are entitled to recovery of their reasonable and entire compensation for such use;

C. Entry of judgment that the United States has used and/or had manufactured the invention described in and covered by U.S. Patent No. 8,365,648 without license or lawful right within the meaning of 28 U.S.C. § 1498 such that Plaintiffs are entitled to recovery of their reasonable and entire compensation for such use;

D. Entry of judgment that the United States has used and/or had manufactured the invention described in and covered by U.S. Patent No. 8,651,008 without license or lawful right within the meaning of 28 U.S.C. § 1498 such that Plaintiffs are entitled to recovery of their reasonable and entire compensation for such use;

E. Entry of judgment that contractor(s) pursuant to at least PIIDs M678540705023, M678540705024, M678540705025, M678540705026, M678540705027, M678540705028, M678540705029, M678540705030, M678540705031, M678540705032, M678540705033, and M6785408D5001, have, with the authorization or consent of the Government, used and/or manufactured for the Government the invention described in and covered by U.S. Patent No. 7,401,540 without license or lawful right within the meaning of 28 U.S.C. § 1498 such that Plaintiffs are entitled to recovery of their reasonable and entire compensation for such use;

F. Entry of judgment that contractor(s) pursuant to at least PIIDs M678540705023, M678540705024, M678540705025, M678540705026, M678540705027,

M678540705028, M678540705029, M678540705030, M678540705031, M678540705032, M678540705033, and M6785408D5001, have, with the authorization or consent of the Government, used and/or manufactured for the Government the invention described in and covered by U.S. Patent No. 8,365,648 without license or lawful right within the meaning of 28 U.S.C. § 1498 such that TRP is entitled to recovery of its reasonable and entire compensation for such use;

G. Entry of judgment that contractor(s) pursuant to at least PIIDs M678540705023, M678540705024, M678540705025, M678540705026, M678540705027, M678540705028, M678540705029, M678540705030, M678540705031, M678540705032, M678540705033, and M6785408D5001, have, with the authorization or consent of the Government, used and/or manufactured for the Government the invention described in and covered by U.S. Patent No. 8,651,008 without license or lawful right within the meaning of 28 U.S.C. § 1498 such that Plaintiffs are entitled to recovery of their reasonable and entire compensation for such use;

H. Entry of judgment that the Government has taken the I-3 Proprietary Information without providing just compensation pursuant to the Fifth Amendment of the United States Constitution and award to Plaintiffs just compensation for the taking in an amount to be determined at trial;

I. Entry of judgment that the Government has breached the implied-in-fact contract with Plaintiffs and award to Plaintiffs damages resulting from that breach in an amount to be determined at trial;

J.  Entry of judgment that the Government has misappropriated Plaintiffs' trade secrets and award to Plaintiffs damages resulting from that misappropriation in an amount to be determined at trial;

K.  Entry of judgment of an award to Plaintiffs for the reasonable and entire compensation owed to Plaintiffs due to the Government's infringement of the '540, '648 and '008 Patents in an amount to be determined at trial, plus interests and costs, in an amount to be determined at trial;

L.  Award Plaintiffs all costs, interest, fees, expenses, and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law; and

M.  Such other relief as the Court may deem appropriate.

Respectfully submitted,

IDEAL INNOVATIONS, INC., THE RIGHT PROBLEM,
LLC, AND ROBERT KOCHER

By counsel,

Thomas L. Halkowski
Ahmed Davis
FISH & RICHARDSON P.C.
The McPherson Building
901 15th Street, NW, Suite 700
Washington, DC 20005
202-783-5070
halkowski@fr.com

Dated: June 29, 2017