## UNITED STATES COURT OF FEDERAL CLAIMS

IDEAL INNOVATIONS, INC.,
THE RIGHT PROBLEM, LLC, and
ROBERT KOCHER

                    Plaintiffs,

       v.

THE UNITED STATES OF AMERICA,

                  Defendant.

No. 17-889 C (EJD)


## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS


Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel. 202 429 3000
Fax. 202 429 3902
jcaracappa@steptoe.com

*Counsel for Ideal Innovations, Inc., The
Right Problem, LLC, and Robert Kocher*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

ARGUMENT......................................................................................................................11

I.      THIS COURT HAS JURISDICTION BECAUSE PLAINTIFFS FILED SUIT
WITHIN SIX YEARS OF THE ACCRUAL OF THEIR CLAIMS ................................11

       A.     The '648 and '008 Patents Issued Within the Past Six Years................................12

       B.     The Remaining Claims Are Timely Because They Accrued No Earlier
than October 2012................................................................................................12

            1.     Plaintiffs' Administrative Claim Makes this Suit Timely Even
Accepting the Government's Proposed Accrual Date ..............................13

            2.     Plaintiffs Were Unaware of Critical Facts until 2012................................14

            3.     The Government's Arguments for a July 2008 Accrual Date Lack
Merit........................................................................................................20

II.     THE ANTI-ASSIGNMENT ACT DOES NOT BAR THE PATENT CLAIMS .............21

III.   THE GOVERNMENT'S ARGUMENTS FOR DISMISSAL OF THE TRADE
SECRET CLAIMS LACK MERIT ...............................................................................26

       A.     Plaintiffs Properly Marked Their Trade Secrets Confidential ...............................26

       B.     Plaintiffs Did Not Disclose the Trade Secrets at Issue in This Litigation .............29

       C.     This Court Has Jurisdiction over Trade Secret Claims..........................................31

CONCLUSION...................................................................................................................31

# TABLE OF AUTHORITIES

**Cases** ..................................................................................................................... **Page(s)**

*3rd Eye Surveillance v. United States,*
   133 Fed. Cl. 273 (2017) ...............................................................................23

*Bondyopadhyay v. United States,*
   No. 14-147C, 2015 WL 1311726 (Fed. Cl. Mar. 20, 2015) ....................................13

*Connell v. KLN Steel Products,*
   No. 04-C-194, 2009 WL 691292 (N.D. Ill. Mar. 16, 2009) ...................................28

*Covenant Aviation Security v. Berry,*
   15 F. Supp. 3d 813 (N.D. Ill. 2014) ....................................................................30

*Demodulation v. United States,*
   103 Fed. Cl. 794 (2012) ...............................................................................31

*Dow Chem. Co. v. United States,*
   32 Fed. Cl. 11 (1994), *aff'd in relevant part, rev'd in part*, 226 F.3d 1334
   (Fed. Cir. 2000)...............................................................................14

*Gal-Or v. United States,*
   113 Fed. Cl. 540 (2013) ...............................................................................31

*Grayton v. United States,*
   92 Fed. Cl. 327 (2010) ...............................................................................28

*Hopland Band of Pomo Indians v. United States,*
   855 F.2d 1573 (Fed. Cir. 1988)...............................................................11, 15, 19

*Kingan & Co. v. United States,*
   44 F.2d 447, 71 Ct. Cl. 19 (Ct. Cl. 1930).......................................................24, 25

*L–3 Communications Integrated Systems v. United States,*
   84 Fed. Cl. 768 (2008) ...............................................................................23

*L-3 Communications Integrated Systems v. United States,*
   79 Fed. Cl. 453 (2007) ...............................................................................20

*Leonardo v. United States,*
   55 Fed. Cl. 344 (2003) ...............................................................................14

*Leucadia v. Applied Extrusion Technologies,*
   755 F. Supp. 635 (D. Del. 1991).......................................................................30

*Manchester Band of Pomo Indians v. United States,*
   363 F. Supp. 1238 (N.D. Cal. 1973) ...................................................................19

*Martinez v. United States*,
  333 F.3d 1295 (Fed. Cir. 2003) (*en banc*) ....................................................................15, 20

*McCreary v. United States*,
  35 Fed. Cl. 533 (1996), *aff'd*, 114 F.3d 1206 (Fed. Cir. 1997)................................................13

*MDS Associates v. United States*,
  31 Fed. Cl. 389 (1994) ...........................................................................................23, 24, 26

*Mission Measurement Corp. v. Blackbaud*,
  216 F. Supp. 3d 915 (N.D. Ill. 2016) .....................................................................................30

*Patterson v. United States*,
  173 Ct. Cl. 819 (1965) ..........................................................................................................23

*Petro-Hunt v. United States*,
  90 Fed. Cl. 51 (2009) ............................................................................................................19

*Ruckelshaus v. Monsanto*,
  467 U.S. 986 (1984)...............................................................................................................31

*Seaboard Air Line Ry. v. United States*,
  256 U.S. 655 (1921)..........................................................................................................24, 25

*Spevack v. United States*,
  182 Ct. Cl. 884, 390 F.2d 977 (1968) ....................................................................................19

*Spofford v. Kirk*,
  97 U.S. 484 (1878)...........................................................................................................23, 26

*Standard Manufacturing Co. v. United States*,
  42 Fed. Cl. 748 (1999) .....................................................................................................25, 26

*United States Marine v. United States*,
  722 F.3d 1360 (2013).............................................................................................................31

*United States v. Aetna Cas. & Sur. Co.*,
  338 U.S. 366 (1949)...............................................................................................................23

*United States v. Shannon*,
  342 U.S. 288 (1952)...............................................................................................................23

*Unitrac, LLC v. United States*,
  113 Fed. Cl. 156 (2013), *aff'd*, 589 F. App'x 990 (Fed. Cir. 2015) ......................12, 13, 14, 19

*Xerxe Group v. United States*,
  278 F.3d 1357 (Fed. Cir. 2002).............................................................................................28

*Young v. United States*,
529 F.3d 1380 (Fed. Cir. 2008)...............................................................................................11

**Statutes**

28 U.S.C. § 2501 ......................................................................................................................11

35 U.S.C. § 286.............................................................................................................11, 13, 14

Assignment of Claims Act, 31 U.S.C. § 3727(b)................................................................. *passim*

**Other Authorities**

48 CFR § 15.608 .............................................................................................................8, 27, 28

48 CFR § 15.609 .................................................................................................3, 26, 27, 28, 29

## INTRODUCTION

By 2005, explosively formed projectiles (EFPs) had emerged as the major source of allied casualties in Iraq.  Given the substantial penetrating power of these weapons, the conventional wisdom was that it was impossible to design a functional wheeled vehicle that could carry enough armor to stop them.  Plaintiff Robert Kocher saw the U.S. casualties mount and believed that the EFP threat could be defeated.  Working on his own time and at his own expense, he designed a proprietary armor configuration that defeated this insurgent weaponry by sacrificing protection in certain areas of the vehicle in order to allot sufficient armor to stop EFPs from the directions and angles at which most attacks occurred.

In 2006, Plaintiffs proposed their proprietary armor configuration to the Army and Marine Corps.  Skeptical procurement officials initially rejected the design, believing that EFP protection was not "realistic" and fearing that it "could potentially have adverse effect on many of the current formalized efforts" to purchase mine-resistant vehicles known as "MRAPs" from competing suppliers that could not stop EFPs.  But through a series of tests at the Army Research Laboratory, Mr. Kocher's proprietary armor configuration proved that it could stop every EFP fired against it.  Despite the successful performance, Marine Corps officials still refused to purchase it lest it disrupt their arrangements to purchase MRAPs from existing suppliers.

It was only after the publication of Mr. Kocher's testing results – including several front-page articles in USA Today and a front-page banner headline in Stars and Stripes – that political pressure forced the Marine Corps to accept Mr. Kocher's approach.  But rather than purchase this life-saving design from Plaintiffs, Marine Corps officials took Mr. Kocher's proprietary armor configuration and – without Plaintiffs' knowledge – shared it with their existing suppliers. They then spent billions to purchase up-armored MRAP vehicles equipped with Mr. Kocher's armor design from his competitors in violation of Plaintiffs' trade secrets and patent rights.

Rather than address the merits of Plaintiffs' claims, the government moves to dismiss based on vague claims of untimeliness and inaccurate factual assertions that are not proper on a motion to dismiss.

First, the government asserts that unidentified "public records" and "statements" show that Mr. Kocher "never actually 'invented' the armor at issue."  Mot. at 1.  This is not the case. The government's own records will show that not only did it fail to develop Mr. Kocher's armor solution but its personnel believed that a solution was not "realistic."

Second, the government seeks to dismiss the case as untimely.  But its motion is tellingly vague as to both the timeline and the different claims at issue.  Two of the patents at issue were filed fewer than six years ago, meaning that the accrual date of those claims cannot be outside the six-year window.  Plaintiffs also filed an administrative claim within six years of the government's own alleged accrual date, and that administrative claim was not finally decided before Plaintiffs filed this suit.  That alone makes all of Plaintiffs' claims timely.  But most important, Plaintiffs' claims did not accrue and the six-year limitations period did not begin to run until Fall 2012.  That is when Plaintiffs first knew or should have known of the facts that gave rise to their claims: the government's unlawful disclosure of their proprietary armor configurations to other MRAP vendors and use of those designs in up-armored MRAPs.

Use of Plaintiffs' IP (as opposed to alternative armor designs) is not obvious from mere visual inspection of the exterior of an armored vehicle because Mr. Kocher's design was not the simple addition of armor to the side of a vehicle.  The intellectual property at issue consists of particular weights and thicknesses of the armor protecting the crew compartment and the ratios between the side, front and back armor.  Those cannot be determined simply by looking at a vehicle and taking limited measurements.

Plaintiffs asked the government for details and specifications regarding their competitors' vehicles.  But the Marine Corps MRAP program management office successfully hid the key information.  They misrepresented that the competitor vehicles used different, independently developed armor configurations, not plaintiffs' designs, and withheld key specifications that would show otherwise.  During subsequent trips to Iraq, Mr. Kocher observed MRAPs and attempted to make crude measurements of their dimensions.  But it was not until MRAPs were displayed at the Association of the United States Army (AUSA) conference in October 2012 that Mr. Kocher had a full opportunity to inspect the interior of an up-armored MRAP crew compartment, which, when combined with other publicly available information, provided a basis to conclude that the government was guilty of the misconduct alleged in this case.  As a result of the government's refusal to release the key data, Plaintiffs were unable to learn the truth until Fall 2012, less than five years before they filed suit.

Third, the government alleges a violation of the Assignment of Claims Act.  But its own case establishes that the intra-corporate assignment of patents to an affiliate under common 100% ownership and control does not implicate that law.

Fourth, the government argues that Plaintiffs cannot make out trade secret claims because *some* of their submissions failed to contain markings that comply with FAR § 15.609.  But, as alleged in the Complaint, every one of Plaintiffs' submissions was prominently labeled proprietary.  Compliance with FAR § 15.609 is not a prerequisite for a claim for the taking of trade secrets; FAR § 15.609 only applies to unsolicited proposals, not the briefings that the government claims were improperly marked; and FAR § 15.609 only applies to data, not the armor designs at issue here.  And even if none of that were true, the government would have, at best, a fact-dependent defense that certain trade secrets were disclosed without proper markings,

not grounds for dismissal as a matter of law of Plaintiffs' entire trade secret claim. Finally, the government claims that the trade secret descriptions in the Complaint match content filed publicly before the PTO. This reflects a simple misunderstanding of the standard for pleading trade secret claims. A plaintiff need not disclose its trade secrets in the complaint itself because that would destroy the trade secrets. As is proper, Plaintiffs' complaint describes the trade secrets without disclosing the secrets themselves.

For these reasons the Motion to Dismiss should be denied.

## BACKGROUND

Plaintiff Robert Kocher is a twenty-one year Army veteran who served as a program manager at the Defense Advanced Research Projects Agency (DARPA). There he worked on armor programs and was responsible for initial development of the armored HMMWV (commonly known as the Humvee). In 1998, after leaving military service, Mr. Kocher formed Plaintiff Ideal Innovations, Inc. (I-3), to develop new technologies to protect the health and safety of U.S. military personnel and civilians deployed abroad. I-3 has more than 120 employees and more than $25 million in annual revenue. Mr. Kocher has more than 40 patents issued or pending. Kocher Decl. ¶¶ 1-5.

By 2005, explosively formed projectiles ("EFPs") had emerged as a major threat to U.S. personnel in Iraq. The EFP was effective not only against armored HMMWVs but from certain angles could defeat the armor even of heavy tracked vehicles such as the Abrams main battle tank and Bradley infantry fighting vehicle. By the end of 2005, a substantial portion of U.S. casualties were being attributed to EFPs. Kocher Decl. ¶¶ 6-7.

Given the ability of the EFP to penetrate substantial armor, the consensus was that it was impossible to design a cost-effective, functional wheeled vehicle that could provide protection from EFPs. Kocher Decl. ¶ 7. The amount – and therefore the weight – of armor required to

fully armor a vehicle sufficient to defeat EFPs was so large that it could not be carried on a

vehicle of reasonable size and horsepower.  *Id*.  As a result, EFP protection was not available on

the new Mine Resistant Ambush Protected (MRAP) vehicles that were in the works to replace

the HMMWV over the following months.  Kocher Decl. ¶ 14.  Army officers Mr. Kocher spoke

to had been told by acquisition representatives that EFP levels of protection were not possible.

Kocher Decl. ¶ 8.

   Undeterred, Mr. Kocher continued to devote thought to the problem.  After extensive

research, Mr. Kocher realized that it would be possible to design a new and non-traditional armor

arrangement that could defeat the vast majority of EFP attacks.  This required carefully choosing

where to place the heaviest armor – based on how IEDs were commonly used and how the EFP

was usually deployed – and leaving many areas of the vehicle lightly armored or unarmored.

Kocher Decl. ¶ 9.  Ultimately, Mr. Kocher designed an armor configuration he called the Highly

Survivable Urban Utility Vehicle (HSUUV).  The HSUUV used a novel and proprietary

arrangement of light and heavy armors to provide protection against EFPs shot from the angles at

which the bulk of attacks occurred, while limiting total armor and weight so that the armor

package could be carried.  Kocher Decl. ¶ 10.  Contrary to the characterization offered in the

government's motion to dismiss, Mot. at 1, Mr. Kocher does not claim a particular composition

of the armor itself.  Rather, it is Mr. Kocher's proprietary armor ***configuration*** that allowed a

wheeled vehicle to carry sufficient armor to stop the vast majority of EFP attacks without

compromising mobility and functionality.  Kocher Decl. ¶ 9 & Ex. 1.

   Mr. Kocher filed a provisional patent application on August 17, 2005 for what ultimately

issued on July 22, 2008 as U.S. Patent No. 7,401,540 (the '540 patent).  He then proposed his

solution to the Army's Rapid Equipping Force (REF).  The director of the REF was interested

and forwarded the brief to the Army's Tank-automotive and Armaments Command (TACOM) and Research, Development, and Engineering Command (RDECOM).  Kocher Decl. ¶ 12.

TACOM and RDECOM, however, concluded that Mr. Kocher's proposed solution was unrealistic.  Army personnel "doubt[ed] the realism of this proposal" and were "highly skeptical" of the "claim made in the presentation" that Mr. Kocher's armor solution could stop EFPs. Kocher Decl. ¶ 13 & Ex. 2.  In a February 3, 2006 memorandum rejecting Mr. Kocher's approach, TACOM stated that "2 years and $15M would be somewhat closer to a realistic scenario" for developing a solution.  Kocher Decl. ¶ 15 & Ex. 3.

But the formal memorandum did not disclose the real reason for the rejection.  That is reflected in the military's internal correspondence and has nothing to do with the quality of Mr. Kocher's design.  Instead, it had to do with the fact that the success of Mr. Kocher's design would threaten the existing the MRAP program and supplier relationships.  By this time, the Marine Corps had issued a formal solicitation and was preparing to award contracts for thousands of MRAP vehicles that were designed to defeat mines (the major pre-2005 ambush threat) but could not stop the newly-emerging EFPs.  Kocher Decl. ¶ 14.  As TACOM personnel wrote in an internal email, adopting Mr. Kocher's approach "could potentially have adverse effect on many of the current formalized efforts" with other suppliers, that were then underway to build these armored personnel vehicles that could not stop an EFP.  Kocher Decl. Ex. 2.  Put another way, Mr. Kocher's HSUUV proposal was not in synch with the multi-billion-dollar MRAP procurement timeline, which did not require protection against the fast-emerging EFP threat out of belief that it could not be done.

As 2006 wore on, EFPs continued to kill and injure U.S. soldiers in increasing numbers. Mr. Kocher again presented his proposal to the REF director, who agreed to shoot Mr. Kocher's

design to see if it could in fact stop an EFP as Mr. Kocher had claimed.  Kocher Decl. ¶ 16.

There were "concerns centered on [RDECOM] senior leadership buy in since it is a very

different approach to current efforts."  Kocher Decl. ¶ 17 & Ex. 4.  Nonetheless, Plaintiffs built

two targets at their own expense and delivered them to the Army Research Laboratory.  The test

was successful against the EFPs.  Kocher Decl. ¶ 16.

After this successful test, the Army awarded Plaintiff I-3 a purchase order for two

prototype vehicles equipped with Mr. Kocher's armor system.  *Id.*  The two prototypes were

tested extensively at the Army Research Laboratory's Aberdeen Proving Ground from March 6-

19, 2007.  The vehicles stopped every EFP shot, including two EFPs fired at the same time.  One

of the prototypes, nicknamed the "Bull," was brought to the Pentagon so that the Under

Secretary of Defense for Acquisition, Technology, and Logistics could personally look at the

vehicle.  Kocher Decl. ¶ 19.  Already in January 2007, however, the Department of Defense had

awarded billions of dollars in contracts for MRAP I vehicles, which were designed to defeat

mines but could not stop an EFP.  Kocher Decl. ¶ 20.

Based on the successful tests, Plaintiffs submitted unsolicited proposals to TACOM and

to the U.S. Marine Corps Systems Command ("MARCORSYSCOM").  Kocher Decl. ¶ 21 &

Exs. 5-6.  The Marine Corps rejected the proposal as invalid by claiming that "it addresses a

previously published agency requirement for MRAP vehicles."  Kocher Decl. ¶ 22 & Ex. 7.

Plaintiffs made repeated requests for a copy of the published requirement but it was not

provided.  Kocher Decl. ¶ 23 & Ex. 8.  Plaintiffs also stated in a letter to the contracting officer,

"as you are aware, the Marine Corps is prohibited from 'us[ing] any data, concept, idea, or other

part of an unsolicited proposal as the basis, or part of the basis, for a solicitation or in

negotiations with any other firm unless the offeror is notified of and agrees to the intended use.'

FAR §15.608(a).  As such, the Marine Corps may not base a procurement, in whole or in part, on any of the confidential information that $I^3$ disclosed to the Marine Corps in $I^3$'s unsolicited proposal.  We trust that the Marine Corps will abide by this prohibition."  *Id.*

Despite the Marine Corps rejection, the successful EFP tests started to gain attention. Then-Senator Joseph Biden wrote to Secretary of Defense Gates on May 29, 2007 asking him to consider the HSUUV as a solution to stop EFPs.  Kocher Decl. ¶ 25 & Ex. 12.  Page one stories in USA Today explained that "the military plans to spend as much as $25 billion for up to 22,000 Mine Resistant Ambush Protected (MRAP) vehicles . . . but the armor on those vehicles cannot stop the newest bomb to emerge, known as an explosively formed penetrator (EFP)," described the HSUUV as "proven effective at repelling blasts from explosively formed penetrators, or EFPs" in "successful[] test[ing] by the Pentagon," and quoted Senator Biden touting the HSUUV as a "proven technolog[y] to beat" EFPs.  Kocher Decl. ¶ 24 & Exs. 9-11.  On June 12, 2007, the front page of Stars and Stripes was devoted to the HSUUV's successful test:



In July, Senator Biden testified before the key Congressional committees about the Bull and also added $200 million for the Bull and $200 million for the development of EFP protection in an amendment to HR 1585, DoD Authorization Act for Fiscal Year 2008.  The amendment proposed $23.6 billion in total funding for MRAPs.  Kocher Decl. ¶ 25 & Ex. 13.

Given MARCORSYSCOM's ongoing expenditure of billions of dollars for MRAP I vehicles that were vulnerable to the EFP threat, these events placed significant pressure on the MRAP program manager's office.  Kocher Decl. ¶ 26 & Ex. 14.  On July 31, 2007, the program manager's office issued an RFP for the MRAP II, which would be required to stop an EFP. Plaintiff I-3 tendered the HSUUV in response.  Kocher Decl. ¶ 27.

On December 18, 2007, I-3 and its partners were awarded an $18 million task order to build six Bull prototypes.  The same day, MRAP I vendors were awarded $2.6 billion to up-armor their MRAP I vehicles to comply with new EFP requirements.  Kocher Decl. ¶ 28 & Ex. 15.  At that time, Plaintiffs did not know whether the MRAP I up-armor designs infringed the patents-in-suit or were based on Plaintiffs' trade secret information that had been shared with the government during submission and testing of the HSUUV prototypes. Kocher Decl. ¶ 29.  In particular, Plaintiffs did not know the exact armor configurations, including the weight or thickness ratios of the crew compartments.  *Id*.  Plaintiffs also did not know whether the other MRAP vendors had developed their designs on their own or had received confidential information from Plaintiffs' submissions or the HSUUV tests at ARL.  Kocher Decl. ¶ 30.  The government and the MRAP contractors stated that the MRAP I up-armor designs were proprietary and would not share those designs nor disclose what information was provided to the MRAP I vendors.  Kocher Decl. ¶ 29.

On December 12, 2008, Plaintiffs briefed Brigadier General Michael Brogan, the Commander of MARCORSYSCOM, on the matter.  Kocher Decl. ¶ 32.  He stated that the current armor designs "were recently developed" – *i.e.*, after the '540 patent – and that EFP protection had been a requirement of the original MRAP I standard, contained in a classified annex to the original solicitation.  *Id.*  General Brogan also stated that different "MRAP II systems were offered to the field and they chose the system they wanted." *Id.*  Plaintiffs requested a copy of the classified annex, but it was never provided.  Kocher Decl. ¶ 33 & Exs. 17-19.

Following this meeting, Mr. Kocher traveled to Iraq and Afghanistan multiple times in 2009, 2010, 2011, and 2012.  While it is impossible to directly observe MRAP armor weight and thickness ratios, during these trips, Mr. Kocher attempted to make crude measurements of the external dimensions of up-armored MRAP I vehicles in an effort to deduce whether they were based on his technology or whether their armor arrangement was based on different designs and configurations.  Kocher Decl. ¶¶ 35-37.

Mr. Kocher attended the Association of the United States Army (AUSA) conference held October 22-24, 2012.  Kocher Decl. ¶ 38.  At that conference, MRAP I manufacturers displayed competing MRAP vehicles and distributed advertisements with claimed armor protection levels from a 360-degree perspective around the vehicle.  *Id.*  Mr. Kocher was able to inspect the interior of the crew compartment, take detailed measurements of the front, back, and side armor protection, and speak with sales representatives about the design and protection levels.  *Id.*  By this time Mr. Kocher had also seen enough vehicles in Iraq and observed sufficient similarities among them to have reason to believe that the up-armored MRAP I vehicles likely were based on the disclosure of his designs by the government to other MRAP vendors.  Only after combining

his October 2012 detailed observations with inferences about weight and thickness from published materials, known ballistics-to-weight ratios, and insights obtained during trips to Iraq and Afghanistan was Mr. Kocher was able to determine that the MRAP I up-armored vehicles in the field did make use of his proprietary armor system.  Kocher Decl. ¶ 39.

On July 17, 2014, Plaintiffs filed an administrative claim with the United States Navy in an effort to resolve this matter.  Kocher Decl. ¶¶ 42-43 & Exs. 20-21.  The Navy sent a denial letter on January 31, 2017.  Kocher Decl. ¶ 44 & Ex. 22.  Subsequent to that letter, however, Plaintiffs engaged in extensive email and telephonic discussions with the Navy, culminating in a follow-up meeting on May 31, 2017, in which the Parties discussed resolution of the claims at issue in this litigation.  Kocher Decl. ¶ 45 & Exs. 23-24. The Navy promised to revisit the claim and respond within three weeks.  At the conclusion of those three weeks, the Navy asked for more time.  *Id*.  Mr. Kocher grew frustrated with the delay and filed this lawsuit on June 29, 2017.  Kocher Decl. ¶ 46.

## ARGUMENT

## I.   THIS COURT HAS JURISDICTION BECAUSE PLAINTIFFS FILED SUIT WITHIN SIX YEARS OF THE ACCRUAL OF THEIR CLAIMS

To be timely, a claim in this Court must be "filed within six years after such claim first accrues."  28 U.S.C. § 2501.  "It is a plaintiff's knowledge of the facts of the claim that determines the accrual date."  *Young v. United States*, 529 F.3d 1380, 1385 (Fed. Cir. 2008).  Thus, a claim first accrues "only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988).  In addition, the "six-year limitations period established by 28 U.S.C. § 2501 is modified by 35 U.S.C. § 286," which provides that the period between the submission of a claim for compensation to the

relevant agency and the denial of that claim "shall not be counted" as part of the time period

between accrual and filing.  *Unitrac, LLC v. United States*, 113 Fed. Cl. 156, 164 (2013), *aff'd*,

589 F. App'x 990 (Fed. Cir. 2015).  Here, Plaintiffs did not know – and could not have known –

of the facts that fix the government's liability until well within six years of the June 29, 2017

filing of the Complaint.

> ### A.      The '648 and '008 Patents Issued Within the Past Six Years

Counts II and III are timely based on the issue dates of the patents as to which they claim

infringement.  Count II claims infringement of United States Patent No. 8,365,648 ("the '648

Patent"), which issued on February 5, 2013.  Count III claims infringement of United States

Patent No. 8,651,008 ("the '008 Patent"), which issued on February 18, 2014.  The "events

which fix" the government's liability for infringement of those patents could have occurred no

earlier than their issue dates.  And both dates are within six years of June 29, 2017.  The

government does not attempt to address any of these facts, which render Counts II and III timely.

> ### B.      The Remaining Claims Are Timely Because They Accrued No Earlier than October 2012

Plaintiffs remaining claims are timely for two reasons.  First, Plaintiffs filed an

administrative claim on July 17, 2014 – less than six years after the government's claimed

accrual date of July 22, 2008.  Because evaluation of that claim was ongoing when Plaintiffs

filed suit, this action is timely.  Second, this action would be timely regardless because Plaintiffs

were not and should not have been aware of the facts that fix the government's liability within

the applicable limitations period.  The government's withholding of critical information

prevented Plaintiffs from knowing critical facts until 2012, less than six years prior to the date

Plaintiffs filed suit.

### 1.      Plaintiffs' Administrative Claim Makes this Suit Timely Even Accepting the Government's Proposed Accrual Date

As the government acknowledges, 35 U.S.C. § 286 tolls the six-year limitations period during the pendency of a properly submitted administrative claim of infringement.  MTD at 18-19; *see also Unitrac*, 113 Fed. Cl. at 164; *McCreary v. United States*, 35 Fed. Cl. 533, 545-46 (1996), *aff'd*, 114 F.3d 1206 (Fed. Cir. 1997); *Bondyopadhyay v. United States*, No. 14-147C, 2015 WL 1311726, at *4 (Fed. Cl. Mar. 20, 2015).  The government also does not dispute that Plaintiffs filed a July 17, 2014 administrative claim under DFARS Subpart 227.70.  *See* Kocher Decl. ¶¶ 42-43 & Exs. 20-21.[1]  That is less than six years after the July 22, 2008 accrual date claimed in the government's brief.  Mot. at 17.

The Navy sent a letter denying this administrative claim on January 31, 2017.  Kocher Decl. ¶ 44 & Ex. 22.  However, the Parties continued to negotiate, and the January 31 letter did not end the administrative proceedings.  Plaintiffs continued to exchange emails and phone calls with the Navy, and a follow-up meeting occurred on May 31, 2017, in which the Parties discussed potential resolution of the claim.  Kocher Decl. ¶ 45.  At that meeting, the Navy promised to revisit the claim and respond within three weeks.  *Id*.  In subsequent emails, the Navy asked for additional exhibits with which to perform its re-analysis and promised to be "back in touch with you as soon as possible."  Kocher Decl. Exs. 23 & 24.  At the end of those three weeks, the Navy asked for more time.  Kocher Decl. ¶ 45.  Believing that he was being strung along, Plaintiff Kocher made the decision to file this claim on June 29.  Kocher Decl. ¶ 46.

---

[1] The Complaint inadvertently misstated the date of this claim as July 28, 2014.  Compl. ¶ 10.  However, the claim itself reflects that it was submitted on July 17, 2014, and the government's own correspondence reflects that it received the claim on July 18, 2014.  Kocher Decl. Exs. 20-21.

The continuing discussions extend the tolling period through the filing date of this litigation, notwithstanding the government's January 31 letter.  As this Court held in extending the tolling period past the date of a first denial letter under similar circumstances, section 286 "plainly contemplates an end to administrative proceedings, and the initial determination here was clearly not the 'end' of the proceedings."  *Unitrac*, 113 Fed. Cl. at 164–65.  The statute of limitations continues to be tolled after an initial denial letter where the Plaintiff asks for reconsideration and after "further correspondence and negotiations between the parties the government voluntarily undertook an intensive and careful reconsideration of its position."  *Dow Chem. Co. v. United States*, 32 Fed. Cl. 11, 20 (1994), *aff'd in relevant part, rev'd in part*, 226 F.3d 1334, 1347 (Fed. Cir. 2000).

The government disputes that tolling under 35 U.S.C. § 286 applies to the trade secret claims in Counts IV to VI.  However, this Court has found coordinate tolling of claims arising on the same factual basis as a claim for which an administrative claim was made.  For example, in *Leonardo v. United States*, 55 Fed. Cl. 344, 352–53 (2003), this Court found an administrative tort claim sufficient to toll that copyright statute of limitations because it was a "written claim for compensation which notified the correct agency . . . of the underlying facts of a claim pending against the government and stated a sum certain for the damages."  The same is true here.  The administrative claim states that the government used Plaintiffs' technology in MEAP up-armor kits for MRAP I vehicles and seeks a three percent royalty per infringing vehicle.  Ex. 20 at 2. The factual overlap between the patent and trade secret claims requires coordinate tolling of each.

### 2.     Plaintiffs Were Unaware of Critical Facts until 2012

Regardless of the administrative tolling, the "legal principle is well settled" that Plaintiffs' claims did not accrue until they knew or should have known of the facts on which

those claims are based.  *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (*en banc*) (requiring that "the claimant knew or should have known that the claim existed").  And the earliest Mr. Kocher "should have been aware" of "all the events which fix the government's alleged liability," *Hopland*, 855 F.2d at 1577, was October 2012.

In this case, the events that fix the government's liability are the government's unlawful use of Plaintiff's armor configurations, so the accrual date turns on when Plaintiffs should have been aware of that use.  Plaintiffs could not have been aware earlier than 2012 that competing MRAP II and up-armored MRAP I vehicles used their designs or infringed their patents because Plaintiffs' technology is not the only approach to defeating EFPs, and armor configuration is not apparent simply from viewing the exterior of a vehicle.  Mr. Kocher repeatedly attempted to determine whether the government had shared his trade secret designs with his competitors and whether their vehicles were infringing his patents.  Each time, Marine Corps officials told Mr. Kocher that his competitors used different, independently developed designs while withholding key documents that would have shown otherwise.  It was not until 2012 that Mr. Kocher was able through his own investigation to obtain enough information to determine that his patents had been infringed and his trade secrets used in his competitors' vehicles.

At the threshold, it is not obvious whether an armored vehicle infringes Plaintiffs' patents or uses their trade secrets.  Kocher Decl. ¶¶ 29-30.  The '540 Patent requires, among other things, a "thickness ratio greater than five" of "side armor to either front or back armor of the said armored crew compartment," "a weight ratio in pounds per square foot greater than three of said side armor to either the front or back armor of the said armored crew compartment," and a "side armor with mass ranging from 60 to 250 pounds per square foot" and "a thickness from 8-24 inches."  '640 Patent col. 4, lines 28-38.  This cannot be determined simply by viewing a

- 15 -

vehicle, and the precise specifications of military vehicles are not released publicly.  Kocher

Decl. ¶¶ 29-30, 36.  Thus, Mr. Kocher could not have known whether he had a claim for

infringement of the '540 Patent until he knew whether the government was purchasing MRAP

vehicles whose armor met these requirements.

Similarly, Plaintiffs' trade secret claim depends on whether the Plaintiffs' competitors

developed their designs independently or whether the government shared with them written

submissions, other data, and/or pictures pertaining to Plaintiff's HSUUV prototypes.  Without

knowledge of the government's interactions with other contractors, Plaintiffs could not have

known of the key fact – whether the government shared their trade secret designs with their

competitors – until they had sufficient knowledge of those vehicles' armor designs.  Kocher

Decl. ¶¶ 30, 37.

Plaintiffs attempted to determine these facts as expeditiously as possible but were

repeatedly stymied by the Marine Corps, which indicated at every turn that other MRAP vehicles

used different designs and were developed independently.  Soon after the successful tests of the

"Bull" prototypes at the Army Research Laboratory, on May 23, 2007 Mr. Kocher submitted an

unsolicited proposal to the United States Marine Corps Systems Command.  On June 15, 2007,

the Marine Corps rejected the proposal by claiming that "it addresses a previously published

agency requirement for MRAP vehicles."  Kocher Decl. Ex. 7.  By rejecting the proposal on this

ground, the Marine Corps communicated that its requirements already covered the EFP-defeating

aspects of the HSUUV.  Mr. Kocher asked for a copy of the supposed requirement but did not

receive it.  Kocher Decl. ¶¶ 23, 33 & Ex. 8, 17-19.

Six months later, in December 2007, Plaintiffs were awarded an $18 million Task Order

for six vehicles while the other MRAP I vendors were awarded $2.6 billion to up-armor their

MRAP I vehicles to comply with the new EFP requirements.  At that time Plaintiffs did not know whether the other contractors' designs infringed the '640 patent and whether the government had shared Plaintiffs' trade secret information with its competitors.  Kocher Decl. ¶¶ 29-30.  Plaintiffs did not know the armor distribution, ratios, or weights, each a claim of the '540 patent, much less the armor composition or materials.  Kocher Decl. ¶ 29.  When asked, the government and the MRAP contractors stated that their designs were proprietary.  Kocher Decl. *Id*.  The Government would not share those designs nor disclose what technology was provided to Plaintiffs' competitors.  Kocher Decl. ¶¶ 29-30.

Plaintiffs continued to attempt to find out from the government whether other MRAP II or MRAP I vendors had used their own proprietary designs or had been given access to Plaintiffs trade secret submissions – only to be rebuffed.  On December 12, 2008, Mr. Kocher briefed Brigadier General Michael Brogan, the Commander of Marine Corps Systems Command.  Kocher Decl. ¶ 32.  General Brogan disclaimed any suggestion that other MRAP vendors had been given or had used Plaintiffs' confidential information.  General Brogan stated that their armor designs had been recently developed after the '540 patent and that different "MRAP II systems were offered to the field and they chose the system they wanted.  *Id*.  In other words, General Brogan informed Plaintiffs that different approaches to EFP protection had been developed by different vendors and that units in the field had preferred the independent and different designs of Plaintiffs' competitors.  General Brogan also stated that the requirement for EFP protection was contained in a classified annex and that Plaintiffs could obtain it from the contracting officer.  *Id*.  Despite their requests, Plaintiffs never received a copy of the classified annex.  Kocher Decl. ¶ 33 & Exs. 17-19.

Having failed to obtain the necessary information from the government, Plaintiffs attempted to determine for themselves whether their competitors' vehicles had copied their designs and technology.  This was difficult because the exact arrangement, dimensions, and weight of vehicle armor – key aspects of the technology at issue – are not obvious merely from external observation.  Kocher Decl. ¶ 36.  For example, it is impossible to determine from mere external observation many '540 Patent claim terms such as: the mass per square foot of the side armor and the weight and thickness ratio of the side to the front and back armor of the crew compartment.  '540 Patent Col. 4, lines 29-37; Kocher Decl. ¶ 36.  In subsequent trips to Iraq and Afghanistan in 2009, 2010, 2011, and 2012, Plaintiff Kocher attempted to take measurements of competitors' vehicles and to determine whether their armor configurations infringed his patents and were based on his designs.  Kocher Decl. ¶ 35.

However, it was not until October 2012 that Mr. Kocher was able to conclude that this was the case.  From October 22-24, 2012, Mr. Kocher attended the Association of the United States Army (AUSA) conference, where MRAP manufacturers displayed EFP-protected MRAP variants.  Kocher Decl. ¶ 38.  Mr. Kocher was able to inspect the interior of the crew compartment, make detailed observations of the front, back, and side armor protection, speak with sales representatives about the design and protection levels, and review advertisements containing claimed protection levels from a 360-degree perspective around the vehicle.  *Id.* Deprived by the government of specifications regarding his competitors' designs, it was only at this point that Mr. Kocher was able to conclude that the government had shared his IP and was acquiring vehicles that practiced the weight, thickness, and crew compartment armor ratios of his patents.  Kocher Decl. ¶ 39.

This is exactly the sort of situation in which this Court and the Federal Circuit have found delayed accrual dates based on the Plaintiff's lack of awareness of key facts.  *See Hopland*, 855 F.2d at 1577 (the awareness requirement means that a claim will not accrue where the "government fraudulently or deliberately conceals material facts relevant to a plaintiff's claim so that the plaintiff was unaware of their existence and could not have discovered the basis of his claim"); *Unitrac*, 113 Fed. Cl. at 164 ("that defendant has concealed its acts with the result that plaintiff was unaware of their existence").  A plaintiff's claim will not accrue "where critical facts simply have not been disclosed."  *Petro-Hunt v. United States*, 90 Fed. Cl. 51, 61 & n.7 (2009) ("[T]he mens rea underlying the concealment is largely irrelevant, so long as the nondisclosure prevented the claimant from knowing that its claim had arisen.").

For example, *Spevack v. United States*, 182 Ct. Cl. 884, 390 F.2d 977, 981 (1968), suspended accrual of a patent infringement claim in a case whose facts mirror those here.  In *Spevack*, the plaintiff proposed its invention to the government, which proceeded to use it for four years in secret.  As here, the government performed the patented process secretly, pursuant to applicable security regulations, and there was "nothing in the record to show that plaintiff had access to pertinent AEC classified information during this period from which he could reasonably have suspected defendant's use."  *Id*.; *see also Manchester Band of Pomo Indians v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973) ("the six-year statute of limitations did not begin to run during the period that such use was secret and therefore concealed from plaintiff").  This Court has described as a "classic case for application of the accrual suspension rule" a circumstance in which the in internal details of the government's procurement decision-making were essential to the existence of the plaintiff's claim and those facts were concealed by

the government.  *L-3 Communications Integrated Systems v. United States*, 79 Fed. Cl. 453, 464 (2007).

Here, the government refused repeated requests to turn over documents such as the classified annex and specification documents that would have shown whether it had shared Plaintiff's confidential designs with other vendors during the MRAP II procurement process and whether those vendors' designs infringed the '540 Patent.  That left Plaintiffs unable to discover the key facts that would establish "whether a claim existed," *Martinez*, 333 F.3d at 1319, other than through painstaking diligence of their own.

### 3. The Government's Arguments for a July 2008 Accrual Date Lack Merit

Ignoring all of these considerations, the Government identifies five facts from which it argues that Plaintiffs should have known of their claims as early as July 2008.  Mot. at 17-18. First, the government asserts that Plaintiffs "alleged that as early as August 28, 2006, the Army purchased two prototype vehicles equipped with the armor system at issue from I-3."  Mot. at 17. While true, this does not establish that Plaintiffs should have known that the Government would later share Plaintiffs' designs with the MRAP I contractors or that those contractors' subsequent MEAP designs infringed the '540 Patent.  Second, the government alleges that "I-3 delivered the prototype vehicles to the Army for testing at Aberdeen Proving Ground."  *Id*.  Again, this does not show awareness of trade secret theft or patent infringement involving Plaintiff's competitors.

Third, the government asserts that "As early as June and July 2007, the USMC issued an open request for proposal for vehicles that TRP alleged infringed claim 1 of the patent."  *Id*.  The government argues that "this request for proposal, Plaintiffs alleged, effected the taking of Plaintiffs' trade secrets without compensation."  *Id*. (citing Compl. ¶ 37).  The government, however, misconstrues the Complaint.  It was not the RFP for EFP-protected vehicles that

constitutes trade secret misappropriation or patent infringement.  Plaintiffs do not claim a

monopoly on defeating EFPs.  Rather, as alleged in paragraph 37, the key question is whether the

government secretly provided MRAP I contractors with Plaintiffs' designs to help them satisfy

the RFP's EFP protection requirements and successfully respond to the RFP.  The mere issuance

of an RFP does not answer that question, and Plaintiffs were rebuffed in their efforts to obtain

answers from the Marines.

Fourth, the government asserts that "As early as December 18, 2007, the United States

placed an additional order with I-3 and at least one other contractor for allegedly infringing

armored vehicles" and that "I-3 delivered six vehicles of Plaintiffs' armored vehicles to the

government."  Mot. at 17-18.  But Plaintiff's delivery of six vehicles to the government does not

establish whether their designs had been shared with other vendors.  Finally, the government

argues that "the first of the patents-in-suit issued later that year on July 22, 2008.  The remaining

patents issued thereafter."  Mot. at 18.  However, mere issuance of the patents is not sufficient to

establish that the MRAP up-armor designs are infringing.  Plaintiff's sought those designs from

General Brogan and were turned down, after which it took them until 2012 to determine that key

fact.

As a result, Plaintiffs should not have been aware of the key facts which fix the

government's liability until Fall 2012, after Plaintiff Kocher was able to perform sufficient ad

hoc inspections of the infringing competitors' vehicles during subsequent trips to Iraq and

Afghanistan.  That is easily within the limitations period.

## II.    THE ANTI-ASSIGNMENT ACT DOES NOT BAR THE PATENT CLAIMS

In addition to its statute of limitations argument, the government asserts that the

Assignment of Claims Act, 31 U.S.C. § 3727(b), bars Plaintiffs' patent claims.  This too is

incorrect.  Mr. Kocher's assignment of the three patents-in-suit to The Right Problem, LLC, an

entity of which he is the manager and sole member, does not violate the Act for two reasons. First, there has been no assignment of unliquidated claims because the assignments at issue occurred before any of the claims at issue in this lawsuit accrued.  Second, the government's own authority establishes that intra-corporate patent assignments do not implicate the Assignment of Claims Act where there is no change in ultimate ownership and control.  That is exactly what happened here.  And even if the assignments were improper, the proper remedy would not be dismissal but recovery by Plaintiff Kocher rather than Plaintiff The Right Problem.

As the government acknowledges, the Assignment of Claims Act does not prevent assignment of patents.  It applies only to assignment of accrued and unliquidated claims – "the voluntary assignment of a claim against the United States already known to the assignor."  Mot. at 21; *see also id.* at 22 (acknowledging the importance of accrual).  But there has been no assignment of unaccrued claims here.  Both the '008 and '648 Patents were assigned before they issued – meaning that no claims accrued to Mr. Kocher under those patents.  The application that became the '648 Patent was assigned by Mr. Kocher to The Right Problem on December 26, 2012, and the patent issued on February 5, 2013.  *See* Dkt. 11-4 at 5; Compl. ¶ 10.  Similarly, the application that became the '008 Patent was assigned by Mr. Kocher to The Right Problem on June 20, 2013, and the patent issued on February 18, 2014.  *See* Dkt. 11-4 at 2; Compl. ¶ 11.  As a result, no claims could possibly have accrued under those patents prior to their assignment.

Mr. Kocher assigned the '540 Patent to The Right Problem on March 18, 2011.  But, as explained above, Mr. Kocher did not have knowledge of his claims and those claims did not accrue until Fall 2012.  As a result, there has been no assignment of an unliquidated claim under the '540 Patent either.

Regardless, Mr. Kocher's assignment of a patent to a limited liability company of which he is the sole member does not implicate the Assignment of Claims Act. The Act does not apply unless Plaintiffs' assignment of patent claims "run afoul of the purposes of the Act," and the government's cases establish that no such purpose is at issue here. *3rd Eye Surveillance v. United States*, 133 Fed. Cl. 273, 277 (2017).

The Assignment of Claims Act was designed to protect the Government from "frauds and mischiefs." *Spofford v. Kirk*, 97 U.S. 484, 489 (1878). Its "primary purpose was undoubtedly to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government." *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 373 (1949). The Act also enabled the government to deal with the original claimant to avoid "the necessity of having to inquire into the validity of specific transfers or assignments of the claim, minimiz[e] subjection to successive litigation upon the same claim, . . . eliminat[e] the risk of double payment or multiple liability" and "preserve the Government's defenses against the transferor, which may be inapplicable to a transferee." *L–3 Communications Integrated Systems v. United States*, 84 Fed. Cl. 768, 776 (2008) (quoting *Patterson v. United States*, 173 Ct. Cl. 819, 823 (1965)); *United States v. Shannon*, 342 U.S. 288, 291-92 (1952). Accordingly, the Assignment of Claims Act does not apply to patent assignments that either "qualify for one of [the] judicially-recognized exceptions *or otherwise do not run afoul of the purposes of the Act*." *3rd Eye Surveillance*, 133 Fed. Cl. at 277 (emphasis added).

In *MDS Associates v. United States*, 31 Fed. Cl. 389 (1994), this Court held that the Assignment of Claims Act did not apply to patent claims that had accrued before assignment because none of the Act's purposes were implicated. Through a series of exclusive licenses and assignments, plaintiff MDS Associates, Ltd. obtained the right to sue for damages for past

- 23 -

infringements of the patent-in-suit from co-plaintiff Mr. Bemis.  *Id.* at 391-92.  Despite the government's attempt to invoke the Assignment of Claims Act, this Court allowed the claims to proceed.  *Id.* at 394.  The Act's primary purpose was not implicated as "there has been no allegation concerning trafficking of claims, … all of the parties have possessed interests in the [patent-in-suit] from its inception and, further, … all of the claims relate to one single patent." *Id.* at 393.  Multiple liability was also not a concern: "[A]ll potential plaintiffs desire to assert their claims in this suit and all of the conceivable plaintiffs are original claimants."  *Id.* at 393-394.  And no defenses available to the government would be lost by allowing MDS Associates to assert its claims.  *Id.* at 394.  The government does not dispute that the same is true here.

Applying these principles, both this Court and the Supreme Court have held that intra-company assignments involving no change in ultimate ownership are not relevant for purposes of the Assignment of Claims Act.  Where "in substance . . . there was really no transfer of the subject-matter of the claim in question, for, although the bare legal title to the claim might have passed from Kingan & Co., Limited, to the plaintiff under the deeds referred to in the facts, the equitable ownership of the claim at all times reposed in the same individuals, that is, in the hands of the same stockholders," the Assignment of Claims Act has no effect because "no fraud could be perpetrated upon the Treasury in a transaction of this kind."  *Kingan & Co. v. United States*, 44 F.2d 447, 451, 71 Ct. Cl. 19, 29 (1930); *see also MDS Associates*, 31 Fed. Cl. at 394 (where "the equitable ownership of the claim remain[s] with the same individuals or stockholders after a reorganization," "the *inter-esse* nature of the transfers perpetrated no fraud upon the Government" and the plaintiffs could proceed with their claims).

The Supreme Court came to the same conclusion in its "strikingly analogous" decision in *Seaboard Air Line Railway v. United States*.  *Kingan*, 17 Ct. Cl. at 29.  In *Seaboard Air Line*

*Railway*, the Supreme Court refused to apply the Act on the ground that "We cannot believe that Congress intended to discourage, hinder or obstruct the orderly merger or consolidation of corporations as the various states might authorize for the public interest." *Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 657 (1921).  That principle protecting intra-corporate organization and asset management is exactly applicable here.  Plaintiff Kocher assigned his patents to Plaintiff The Right Problem, of which he is the sole member and manager.  This is not a case in which the government might be prejudiced by an assignment of claims to "a third party who was a complete stranger to the record." *Kingan*, 17 Ct. Cl. at 29.

By contrast, *Standard Manufacturing Co. v. United States*, 42 Fed. Cl. 748, 781 (1999), on which the government heavily relies, is easily distinguishable.  There, the assignee and assignor were separate entities and "admitted that a principal reason for the assignment was to avoid the possibility of exposing any recovery in the instant action to claims for which Standard is responsible to its creditors." *Id*.  That created a real potential for prejudice of the sort the Assignment of Claims Act was intended to avoid.  But even in holding the Act applicable, *Standard Manufacturing* made clear that it did not intend to contravene the rule of MDS Associates that the "Act d[oes] not apply [so long as] transfer of claims perpetrated no fraud upon the government when the same individuals or partners possessed equitable ownership of the claims for purposes of infringement." *Id*.

That is the situation here, and the Government raises none of the concerns that must be implicated for the Assignment of Claims Act to operate.  The government does not assert that Plaintiffs are engaged in "the trafficking of claims by persons of influence who might improperly urge them upon officers of the Government," that there is a "potential of multiple payment of claims by the Government," or that it may lose "defenses against the transferor, which may be

inapplicable to a transferee." *MDS Associates*, 31 Fed. Cl. at 393.  Nor could it.  Patent

assignment is a common industry practice for reasons that have nothing to do with the trafficking

of claims.  The presence of all potentially relevant parties as plaintiffs eliminates any concern

regarding multiple liability, a need to deal with multiple claimants separately, or an inability to

assert counterclaims or defenses against the assignee that would have been available against the

assignor.  *See id.* at 393-94.  As result, there is no occasion here for the "frauds and mischiefs"

that the Assignment of Claims Act was designed to prevent, and the Act does not apply to this

case.  *See Spofford*, 97 U.S. at 489.

Finally, even if the Assignment of Claims Act were applicable, it would not support

dismissal of Plaintiffs' claims.  Rather, it would make the government severally liable to the

different Plaintiffs in this litigation, with Plaintiff Kocher "awarded royalty damages for

infringing procurements which took place prior to its assignment of the [] patent rights to [The

Right Problem], and [The Right Problem] separately [] awarded royalty damages for infringing

procurements which took place after the assignment." *Standard Manufacturing*, 42 Fed. Cl. at

781.  The government fails to grapple with this aspect of the law.  In sum, the Assignment of

Claims Act provides no basis for dismissal of the patent claims.

## III.   THE GOVERNMENT'S ARGUMENTS FOR DISMISSAL OF THE TRADE SECRET CLAIMS LACK MERIT

### A.   Plaintiffs Properly Marked Their Trade Secrets Confidential

Turning to Plaintiffs' three trade secret claims, the government argues that all three

should be dismissed in their entirety for failure to properly mark various submissions as

confidential under FAR § 15.609.  The argument suffers from myriad flaws.

As alleged in the Complaint and reflected in the government's own record citations,

Plaintiffs marked every one of their submissions as proprietary information.  Compl. ¶¶ 19, 21,

27-29.  The Complaint identifies four such submissions:  briefings in January and June 2006

regarding Mr. Kocher's design, and then – after the successful March 2007 EFP tests at ARL –

two unsolicited proposals to supply the HSUUV to the Army and the Marines in April and May

2007, respectively.  *Id*.  Each was marked proprietary.  *Id*.

      The government argues that only the April and May 2007 submissions contain the

language prescribed by FAR § 15.609.  Mot. at 23.  But that is because only those two were

unsolicited proposals to supply the HSUUV.  Compl. ¶¶ 27-29.  By its express terms, the FAR

applies to "unsolicited proposals."  48 CFR § 15.608, 609.  The two briefings from 2006 were

not unsolicited proposals and therefore were properly marked proprietary rather than according

to the FAR.  Compl. ¶¶ 19, 21.[2]

      In addition, the government fails to distinguish between Count IV for the taking of

Plaintiffs' trade secrets, Count V for breach of an implied contract to maintain the confidentiality

of Plaintiffs' trade secrets, and Count VI for misappropriation of trade secrets.  The government

refers generically to "all of the trade secret claims," Mot. at 23, but its arguments are applicable

only to Count V and only to the extent that claim is for breach of an implied contract that is itself

based on the provisions of the FAR.  By contrast, Counts IV and VI for the taking and

misappropriation of trade secrets are not based on the FAR and therefore do not depend on

Plaintiffs' following the strictures of FAR § 15.609.

      As to non-contractual trade secret claims, marking materials submitted to the government

according to FAR § 15.609 is at most "advisable" and does not preclude trade secret claims.  *See*

---

[2] The government also complains that the Complaint fails to allege that individual sheets
have proper FAR "legends."  Mot. at 23.  As the government is aware, every page of the April
and May 2007 unsolicited proposals has a FAR legend on the bottom.  *See* Kocher Decl. Exs. 5
&6.  To the extent that the Complaint must not only allege inclusion of a FAR statement but
expressly mention page-by-page FAR legends, Plaintiffs respectfully request leave to replead for
this purpose.

*Connell v. KLN Steel Products*, No. 04-C-194, 2009 WL 691292, at *14 n.5 (N.D. Ill. Mar. 16, 2009) (denying Defendants' motion for summary judgment as to trade secret claims).  A trade secret owner's failure to mark prototypes submitted to the Navy according to FAR § 15.609 "does not automatically render its efforts to maintain its secrets per se unreasonable," and "no caselaw indicates that failure to do so should result in the grant of summary judgment against [Plaintiffs]."  *Id.* at *14 n.5 (denying Defendants' motion for summary judgment as to trade secret claims).

This is consistent with the government's own cases, which dismissed only implied contract claims on the basis of FAR § 15.609.  The government's assertion that *Xerxe Group v. United States* applied FAR § 15.609 to uphold dismissal of "trade secret claims" is misleading at best.  There, the plaintiff brought neither a trade secret "misappropriation" nor "takings" claim. Instead, it claimed that the government violated FAR § 15.608, application of which depends on the plaintiff's compliance with FAR § 15.609.  *Xerxe Group v. United States*, 278 F.3d 1357, 1350-60 (Fed. Cir. 2002).  As a result, *Xerxe* stands for the proposition that failure to comply with FAR § 15.609 dooms an implied contract claim brought under the FAR, not that it bars takings claims more generally.

*Grayton v. United States*, 92 Fed. Cl. 327 (2010), on which the government also relies, is to this exact effect.  Applying *Xerxe*, it held that the failure to properly mark submissions under FAR § 15.609 bars an implied contract claim insofar as the implied contract is based on the FAR.  *See id.* at 335.  But that did not end the inquiry as to the plaintiff's "takings" claim as well. To dispose of that claim, the Court considered whether or not the plaintiff had marked the relevant information "confidential" or "trade secret," not whether it had complied with the FAR. *See id.* at 336-37.  Here, the government does not dispute that all of Plaintiffs' submissions were

prominently marked as containing proprietary information.  Compl. ¶¶ 19, 21, 27-29.  As a result, the government's FAR argument applies at most to Count V for breach of implied contract.

Nor does this argument justify dismissal of Count V for breach of the implied contract created by the FAR.  The government does not dispute that the two unsolicited proposals were marked in accordance with the FAR.  Instead, it asserts that while "some pages have markings," "key pages, including those with the alleged trade secret data, either have no FAR § 15.609 markings or lack the legend required by FAR § 15.609(b)."  Mot. at 23.  This is not correct and is a quintessential factual dispute that is improper on a motion to dismiss.  Both unsolicited proposals contained a FAR identification and FAR legends on every single page.  Kocher Decl. Exs. 5 & 6.  And the government's own submissions show that there are FAR legends on the key pages even of the "presentations" it attaches to its brief.  *E.g.*, Dkt. 11-6 at 105, 108.  On summary judgment, the government may have a partial defense to Count V if they can prove that certain portions of Plaintiffs' trade secret information were disclosed without properly being marked confidential.  But there is no basis to dismiss Count V in its entirety – much less the remainder of Plaintiffs' trade secret claims – based on the government's conclusory factual assertions at the motion to dismiss stage.

### B.       Plaintiffs Did Not Disclose the Trade Secrets at Issue in This Litigation

Again attempting to decide factual disputes on a motion to dismiss, the government argues that Plaintiffs disclosed their trade secrets in their filings with the PTO.  Mot. at 25-26.  While this argument is not proper at this stage of this litigation, a brief review of the PTO filings shows just the opposite.  The attachments on which the government relies are replete with black boxes by which Plaintiffs redacted the trade secret information before filing it on the public record.  *E.g.*, Dkt. 11-6 at 31, 86-93, 108.

Attempting to sidestep this problem, the government resorts to matching up allegations in the Complaint with unredacted bits of the PTO record in order to show that the trade secrets have been disclosed.  Often, the government's paraphrases create symmetry where none exists in the underlying text.  More importantly, however, the government's approach rests on a fundamental misunderstanding:  the complaint *itself* describes the subject matter of the trade secrets but does not disclose them lest they be destroyed as a result.  Because the Complaint itself does not disclose the trade secrets, any overlap between its descriptions of the trade secrets and the descriptions contained in Plaintiffs' patent filings does not show that the trade secrets were disclosed to the PTO.

It is well established that a plaintiff asserting trade secret claims need not reveal its trade secrets in the complaint as doing so would result in their public disclosure.  *See Mission Measurement Corp. v. Blackbaud*, 216 F. Supp. 3d 915, 920-21 (N.D. Ill. 2016).  Indeed, "Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets."  *Leucadia v. Applied Extrusion Technologies*, 755 F. Supp. 635, 636 (D. Del. 1991).  Courts have accordingly deemed trade secret allegations "adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms."  *Covenant Aviation Security v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases).[3]

The government's authority for the generic proposition that disclosure of trade secrets undermines a trade secret claim is beside the point.  Indeed, the only case the government cites

_____

[3] Plaintiffs have met and exceeded this pleading requirement with respect to their trade secrets.  Plaintiffs have described the information constituting trade secrets as well as its application of industry-standard measures and consistent labeling of materials shown to the Government to maintain secrecy in detail.  *See* Compl. ¶ 19, 21, 26, 27, 89.

as support for deciding trade secret status at the dismissal stage involved a complaint that *itself* contained facts that "undeniably placed [the plaintiff's] ideas in the public domain." *Gal-Or v. United States*, 113 Fed. Cl. 540, 555 (2013).  The plaintiff in *Gal-Or* had also failed to "place *any* restrictive markings" on his submissions to the government, and his identification of trade secrets in the complaint was "so vague that the [complaint] fail[ed] to meet the pleading requirements of RCFC 8." *Id.* at 554 (emphasis added).  On the contrary, the Complaint here does not contain facts showing of public disclosure of trade secrets and rather reflects consistent efforts to maintain their secrecy.

### C.     This Court Has Jurisdiction over Trade Secret Claims

Finally, the Government argues that Plaintiffs "cannot recover on a misappropriation theory" because "the Court lacks jurisdiction over all such tort claims."  Mot. at 27.  But its cases hold just the opposite.  While *dicta* in *United States Marine v. United States*, 722 F.3d 1360, 1372 (2013), provides that misappropriation claims may not proceed in this Court as *tort* claims, the opinion goes on to conclude that there is a "meaningful remedy in the Claims Court" for trade secret misappropriation pleaded as a takings claim or under an implied contract theory.  *Id.* at 1372-74; *see also Ruckelshaus v. Monsanto*, 467 U.S. 986, 1004 (1984); *Demodulation v. United States*, 103 Fed. Cl. 794, 811 (2012) ("*Monsanto* squarely holds that the United States Court of Federal Claims has jurisdiction to adjudicate claims alleging a governmental taking of trade secrets.").  That is exactly what Plaintiffs have done here, *see* Compl. ¶¶ 87-103, and the government does not dispute that Plaintiffs have adequately pleaded a claim for a taking of trade secrets.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied.

Dated:  January 23, 2018

Respectfully submitted,

/s/ John M. Caracappa
John M. Caracappa (Attorney of Record)
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel. 202 429 6267
Fax. 202 429 3902
jcaracappa@steptoe.com

*Counsel for Ideal Innovations, Inc., The Right Problem, LLC, and Robert Kocher*

*Of Counsel*:

Jeffrey M. Theodore
Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel. 202 429 8139
Fax. 202 429 3902
jtheodore@steptoe.com

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing and the accompanying declaration of Robert Kocher by filing it via the Court's ECF system of January 23, 2018, thereby serving all counsel of record.

/s/ John M. Caracappa
John M. Caracappa