## UNITED STATES COURT OF FEDERAL CLAIMS

IDEAL INNOVATIONS, INC.,
THE RIGHT PROBLEM, LLC, and
ROBERT KOCHER

                    Plaintiffs,

     v.

THE UNITED STATES OF AMERICA,

                  Defendant.

No. 17-889 C (EJD)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Steptoe & Johnson LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel. 202 429 3000
Fax. 202 429 3902
jcaracappa@steptoe.com

*Counsel for IDEAL INNOVATIONS, INC.,*
*THE RIGHT PROBLEM, LLC, and*
*ROBERT KOCHER*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................3

ARGUMENT ................................................................................................................5

I.    THE DARPA PRESENTATION IS NOT PROPER MATERIAL FOR THE
      ON-SALE BAR. ....................................................................................................6

      A.    The DARPA Presentation was not a Commercial Offer for Sale. ...........6

      B.    DARPA Could not have Formed a Contract with I-3 Without Further
            Manifestation of Assent to Conclude a Bargain. ...................................12

II.   THE CRADA DID NOT CONFER A LICENSE TO PRACTICE OR HAVE
      PRACTICED THE '648 OR '008 PATENTS ON THE GOVERNMENT. ...................17

      A.    The CRADA License Covered Inventions Relating to ARL's Armor
            Technology and Integration, Not Configuration. ....................................18

      B.    Mr. Kocher Reduced the Patented Inventions to Practice Prior to the
            CRADA's Effective Date. ....................................................................20

CONCLUSION ...........................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*ABB Turbo Systems AG v. Turbousa, Inc.*, 774 F.3d 979 (Fed. Cir. 2014) ................................. 23

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 5

*Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 135 (Fed. Cir. 2007)....................................... 9, 10

*Carter v. United States*, No. 17-587C, 2018 WL 651369 (Fed. Cl. Jan. 31, 2018)...................... 5

*Clock Spring, L.P., v. Wrapmaster, Inc.*, 560 F.3d 1317 (Fed. Cir. 2009) .................................. 11

*Elan Corp., PLC v. Andrx Pharmaceuticals, Inc.*, 366 F.3d 1336 (Fed. Cir. 2004)...................... 9

*Fisher-Price, Inc. v. Safety 1st, Inc.*, 109 F. App'x 387 (Fed. Cir. 2004) ................................... 13

*Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041 (Fed. Cir. 2001) ........................ passim

*Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 855 F.3d 1356 (Fed. Cir. 2017)... 13

*Kalos v. United States*, 368 F. App'x 127 (Fed. Cir. 2010)......................................................... 23

*Lack Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335 (Fed. Cir. 2003) ................................................................................................................................. 12, 13

*Linear Technology Corp. v. Micrel, Inc.*, 275 F.3d 1040 (Fed. Cir. 2001) ................... 7, 8, 10, 13

*Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363 (Fed. Cir. 2016) (en banc) ................................. 6

*Metallizing Engineering. Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d. Cir. 1946) ........................................................................................................................................... 16

*Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55 (1998) ......................................................... 6, 10, 16

*Polara Engineering Inc. v. Campbell Co.*, 894 F.3d 1339 (Fed. Cir. 2018).............................. 11

*Scaltech Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321 (Fed. Cir. 2001) ....................................... 9, 10

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001).............................................. 5

*Sparton Corp. v. United States*, 89 Fed. Cl. 196 (2009) ............................................................ 17

*Trading Technologies International, Inc. v. eSpeed, Inc.*, 595 F.3d 1340 (Fed. Cir. 2010)........... 8

## Statutes

15 U.S.C. § 3703 ......................................................................................................................... 18

35 U.S.C. § 102 ............................................................................................................................. 6

## Other Authorities

Restatement (Second) of Contracts § 24.......................................................................................... 7

Restatement (Second) of Contracts § 26..................................................................................... 7, 13

Restatement (Second) of Contracts § 33.......................................................................................... 8

Uniform Commercial Code § 1-205 ............................................................................................. 12

**Rules of the United States Court of Federal Claims**

RCFC 12 ................................................................................................................................. 5, 6

RCFC 14 .................................................................................................................................... 5

**Federal Acquisition Regulations**

FAR 1.101 ............................................................................................................................... 14

FAR 15.402 ............................................................................................................................. 14

FAR 15.404-4 ......................................................................................................................... 15

FAR 15.603 ............................................................................................................................. 15

FAR 15.605 ....................................................................................................................... 14, 15

FAR 15.609 ............................................................................................................................. 15

FAR 2.101 ............................................................................................................................... 14

**INTRODUCTION**

Plaintiff Robert Kocher developed an innovative configuration of armor that overcame the conventional wisdom that wheeled vehicles could not be heavily armored enough to protect against explosively-formed projectiles. Mr. Kocher briefed several government agencies on his idea, but he largely met skepticism. Nevertheless, Mr. Kocher applied for patents claiming his innovative design, which he ultimately received. In 2006, following successful self-funded tests of his novel configuration, and after Mr. Kocher had already filed his patent applications, the Army Research Laboratory offered to engage in a standard Cooperative Research and Development Agreement with Mr. Kocher and his company, Plaintiff Ideal Innovations, Inc., in order to integrate the Army Research Laboratory's armor technology into a vehicle according to the configuration that Mr. Kocher had already invented. The integration of that particular armor would be a beneficial addition to Mr. Kocher's innovative design, though the design already worked.

Publicity and congressional pressure surrounding Mr. Kocher's innovation after his successful demonstration and the rapidly growing number of fatalities in Iraq that his invention was designed to prevent pressured the Marine Corps to accept Mr. Kocher's approach. But in adopting that life-saving approach, the Marine Corps neither procured production vehicles from Plaintiffs nor did it seek a patent license from them. Instead, the Marine Corps spent billions of dollars to purchase vehicles using Mr. Kocher's patented design from his competitors, leading to this patent infringement action.

Rather than challenge the substance of Plaintiffs' complaint for patent infringement, Defendants contend that public records with no foundation in the complaint support two affirmative defenses. These arguments are far outside the scope of a proper motion to dismiss,

and factual issues necessitate that they be considered, if at all, only once a full factual record has developed.

First, Defendants point to an early briefing that Mr. Kocher made to the Defense Advanced Research Projects Agency, detailing his idea for a new configuration of armored vehicles. Mr. Kocher disclosed this document during the prosecution of one of his patents. The face of the document shows that it falls far short of the kind of communication that can constitute an offer under the on-sale bar, as Defendants contend. Rather, it was a briefing seeking merely to gauge the government's interest in Mr. Kocher's design, which would be costly to develop and test, and risky to implement until proven. Moreover, the factual context surrounding the briefing, and indeed the regulatory context, show that the communication never rose to the level of an offer that the audience of the presentation, a government agent, could accept.

Second, Defendants contend that the government had a license to practice or have practiced any patents issued on Plaintiffs' patent. This theory emerges from a license provision in the agreement governing Plaintiffs' standard Cooperative Research and Development Agreement governing their project with the Army Research Laboratory, which covered inventions made pursuant to that agreement. But that project focused on integrating armor technology into Mr. Kocher's pre-existing design; it did not extend to the invention of that design, which had already been successfully completed prior to the commencement of the project.

Even though these arguments originate outside the complaint, the current record already shows that factual issues predominate in the resolution of Defendants' contentions, and it is inappropriate to resolve those questions on a motion to dismiss.

For those reasons, Defendants' motion to dismiss should be denied.

## BACKGROUND

In 2005, Plaintiff Robert Kocher saw a problem. United States military troops stationed in Iraq and Afghanistan faced an extremely deadly threat: explosively-formed penetrators ("EFPs"), explosive projectiles designed to pierce armor, including the armor on U.S. military vehicles. Compl. ¶¶ 13–16. Mr. Kocher, a twenty-one year Army veteran who had also served as a project manager at the Defense Advances Research Projects Agency ("DARPA"), envisioned a novel and creative solution. *Id.* ¶ 16. Rather than evenly distributing armor around the exterior of the vehicle, which spread protection too thin to guard against EFPs, Mr. Kocher conceived a design that would strategically place extremely thick armor on a vehicle where it was most vulnerable to EFPs, while placing lighter armor in other locations. *Id.* ¶ 17. This had the effect of adding heavy protections where it was most needed, without adding too much weight to the vehicle, thereby slowing it down. *Id.* ¶ 18. He dubbed the design a "Highly Survivable Urban Utility Vehicle" ("HSUUV" or "HUV"). *Id.* ¶ 9.

Mr. Kocher briefed numerous government agencies about his innovation at various stages of development, with limited success. *Id.* ¶¶ 19–21, 26–29, 32. Although the goal of some such presentations at later stages of development was to secure a procurement contract, at least one presentation highlighted the expense in testing his invention and the risk of implementing it prior to proving its success. *See generally* Ex. 1.[1]

While Mr. Kocher was workshopping his invention, he also submitted several patent applications. As part of the prosecution of the application that would issue as U.S. Patent No. 8,365,648 (the " '648 patent"), Mr. Kocher disclosed to the United States Patent and Trademark

---

[1] All references to Ex. __ are exhibits to the Declaration of Salvatore Tamburo in Support of Defendants' Motion to Dismiss Pursuant to RCFC 12(b)(6), Dkt. No. 49-1 (exhibits at Dkt. No. 49-2–6).

Office ("PTO"), that he had briefed Dr. Art Morish of DARPA on his proposed configuration. Ex. 1, at 2. He explained that the presentation was not prior art because "it was not published, it did not constitute an offer for sale, and did not constitute or reflect a public use of the invention." *Id.*

In mid-2006, the U.S. Army Rapid Equipping Force ("REF") agreed to run tests, at Mr. Kocher's expense, of sample armor kits embodying Mr. Kocher's invention. Compl. ¶ 22. "The tests, to the Government's surprise, were successful: Mr. Kocher's armor kits withstood the EFP munitions." *Id.*

Later on, after he had already submitted his vehicle patent applications, the U.S. Army Research Laboratory ("ARL") awarded Mr. Kocher's company, Ideal Innovations, Inc. ("I-3"), a standard Cooperative Research and Development Agreement ("CRADA"), pursuant to which two prototype vehicles incorporating ARL's armor technology into Mr. Kocher's configuration were built and tested. *See generally* Ex. 2. The testing showed that the joint effort to implement ARL's armor technology on Mr. Kocher's design was a success, but the government ultimately declined to purchase production vehicles from Plaintiffs. Instead, the government purchased vehicles implementing Mr. Kocher's patented design from his competitors.

Mr. Kocher discovered Defendants' infringement in 2012, following several trips to Iraq and Afghanistan where he observed the designs being used on armored vehicles in the field. In June 2017, as several administrative proceedings and discussions with the Government dragged on, Plaintiffs filed this action in the Court of Federal Claims. In October 2017, the Government successfully moved to dismiss several claims as time barred, though claims concerning the '648 patent and U.S. Patent No. 8,651,008 (the " '008 patent") (collectively, the "patents in suit"), remain.

The Government, together with several third-parties who had been given notice of this action pursuant to RCFC 14(b)(1) (collectively, "Defendants"), now move to dismiss those remaining claims under RCFC 12(b)(6) based on records outside the complaint they allege support affirmative defenses of invalidity and license. The Court should deny the motion.

## ARGUMENT

Defendants offer two factually incompatible theories to support their motion to dismiss. On one hand, they argue that the inventions were ready for patenting on August 16, 2005, and subject to a commercial offer for sale on that date. On the other hand, Defendants argue that Kocher first reduced his inventions to practice months later in collaboration with ARL under the CRADA. At this stage, the Court "must accept as true all of the allegations in the complaint" and "must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To the extent Defendants' theories do not fail as a matter of law, they cannot be resolved on a motion to dismiss under RCFC 12(b)(6), where all Plaintiffs must do is "raise a reasonable expectation that discovery will reveal" the insufficiency of those defenses as a matter of fact. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

Defendants' theories find no support in the complaint. Rather, the instant motion is based entirely on external documents that Defendants seek to shoehorn into the pleadings via judicial notice. While Plaintiffs do not dispute that the existence of these documents and their literal contents are proper matter for judicial notice, the legal effects of those materials and Defendants' arguments based on them are laden with factual issues that cannot be resolved on a motion to dismiss, where all reasonable inferences must be drawn in Plaintiffs' favor. *See Carter v. United States*, No. 17-587C, 2018 WL 651369, at *5 (Fed. Cl. Jan. 31, 2018) ("[M]ore than mere notice

is called for, . . . interpreting this agreement might entail considering [additional factual matter]. As a consequence, the question is more appropriate for a summary judgment proceeding.").

Accordingly, Plaintiffs respectfully ask that the Court deny defendants' motion to dismiss under RCFC 12(b)(6).

## I. THE DARPA PRESENTATION IS NOT PROPER MATERIAL FOR THE ON-SALE BAR.

Defendants contend that the '648 patent and the '008 patent are invalid under the on-sale bar of pre-AIA 35 U.S.C. § 102(b). Two conditions must be satisfied before the critical date before applying the on-sale bar: (1) "the product must be the subject of a commercial offer for sale," and (2) "the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). The bulk of Defendants' brief focuses on the second prong, treating the finding that the DARPA presentation was a "commercial offer for sale" as fait accompli. But "[w]hether the on-sale bar applies is a question of law based on underlying factual findings." *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1371 (Fed. Cir. 2016) (en banc). So, to the extent the DARPA presentation could even arguably constitute an offer for sale, the resolution of that question rests on underlying factual issues that cannot be determined on a motion to dismiss.

### A. The DARPA Presentation was not a Commercial Offer for Sale.

When, as here, "no actual sale is present" to determine whether the on-sale bar should apply, "'[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration)' triggers the on-sale bar." *Id.* at 1378 (quoting *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001)) (alterations in original). Whether a communication rises to the level of an offer for sale is "a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood." *Group One*, 254 F.3d at 1047.

To that end, the Federal Circuit generally "look[s] to the Uniform Commercial Code ('UCC') to define whether, as in this case, a communication . . . rises to the level of a commercial offer for sale." *Id.* Since "[t]he UCC does not define 'offer,'" the Federal Circuit has also looked to the common law, finding that "'[a]n offer is the manifestation of willingness to enter into a bargain so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts ("Restatement") § 24 (1981)). The determination of "what constitutes an offer" may vary "in any given circumstance" and thus "requires looking closely at the language of the proposal itself. Language suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'are you interested.' Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling." *Group One*, 254 F.3d at 1048 (citing Restatement §§ 24, 26).

The DARPA Presentation lacked the language indicative of a definite offer for sale. Words like "offer," "sale," "price," "delivery," "promise," or "exchange," are nowhere to be found in the presentation. Instead, the presentation used aspirational language and suggested that Mr. Kocher wanted to know if, and to what extent, DARPA shared those aspirations. The Court need look no further than the title of the presentation: "An *idea* for a commercial based, fast, low cost, highly survivable vehicle." DARPA Presentation[2] at Slide 1 (emphasis added). But such forward-looking language pervaded the presentation. For example, in describing the need for vehicles displaying the proposed configuration, Mr. Kocher described that it was "*envisioned* to be a new capability . . . ." DARPA Presentation at Slide 4.

_____
[2] Citations to the DARPA Presentation Slide __ are to pages 6–22 of Ex. 1.

Defendants write that the presentation "insisted that DARPA adopt his HSUUVs 'now.'" Defs' Br. at 15 (quoting DARPA Presentation at Slide 14).  But the cited slide bore the heading, "Why DARPA should do *this* now," and the full context of the slide reveals that the antecedent of "this" is not procurement of a vehicle for immediate adoption, but rather, the actualization of a "[h]igh risk concept—rapidly *seeking* levels of protection never before envisioned . . . ." DARPA Presentation at Slide 14 (emphases added).  This is not the language of an offer to "give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340 (Fed. Cir. 2010).  It is a pitch seeking to test the waters of the government's willingness to undertake the "risk" posed by the concept presented; not an offer to deliver a product that overcame that risk.

Indeed, the presentation contemplated that the benefits of Mr. Kocher's invention would inure to the government only "[i]f the HUV is successful."  DARPA Presentation at Slide 14. Similarly, the presentation billed the value of engaging with I-3 not as any advantageous aspect of product delivery, but rather that it had "been working the idea for over a year."  *Id.* at Slide 13. One would expect the benefit of a commercial offer for sale to inure upon delivery of the product exchanged, not upon some success of that product that remained to be seen.

The offer also lacked definite terms.  To satisfy the on-sale bar, a communication must "contain[] sufficiently definite terms to create an enforceable contract upon acceptance . . . ." *Linear Tech.*, 275 F.3d at 1052.  "Incompleteness of terms is one of the principal reasons why advertisements and price quotations are ordinarily not interpreted as offers."  Restatement § 33(3).  Such indefiniteness suggests that a communications are "preliminary proposals or invitations to negotiate, rather than a formal offer."  *Group One*, 254 F.3d at 1047.

Indeed, even where a communication describes a pricing structure, it may not rise to the level of an offer for sale, especially where additional inputs that would inform the overall price remain to be set. *See Elan Corp., PLC v. Andrx Pharm., Inc.*, 366 F.3d 1336, 1342 (Fed. Cir. 2004). In *Elan*, a pharmaceutical manufacturer sent a letter to prospective licensees of a yet-unfinished product. The letter included details of a pricing structure, and the district court read that section as constituting a price term, thereby establishing an invalidating offer for sale. *Id.* The Federal Circuit reversed, finding that the letter simply gave an estimate of the cost and the cost benefits of using that manufacturer as a supplier, all based on a product that was not yet final.

If, as Defendants' position would require, Dr. Morish could have simply announced "I accept" and thereby formed a contract, many terms of the resulting agreement would have remained uncertain. For example, Plaintiffs would be left to wonder when delivery would need to occur. Where? How? The presentation offered only a timeline based on an unspecified starting point, which included testing, but no delivery of a final product. What would have been the price? The DARPA presentation didn't even use the word "price." Rather, it set out the prospective *cost* of undertaking assembly and testing of two vehicles using the proposed configuration, but it was silent as to who would bear which costs. For example, would Plaintiffs need to acquire a base vehicle? Or would DARPA supply it? Without any certainty concerning these fundamental terms, no contract could have been formed. *See Group One*, 254 F.3d 1041, 1052 (Fed. Cir. 2001) (Lourie, J., concurring) ("No price was specified, no date of delivery.").

This case is unlike *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 135 (Fed. Cir. 2007), or *Scaltech Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321 (Fed. Cir. 2001), which Defendants contend (without any substantive argument) show that the DARPA Presentation was an offer for sale. In

*Cargill*, the communication in question was "unambiguous" as to whether that it constituted an offer for sale. 476 F.3d at 1370. The letter lacked the aspirational and conditional language of the DARPA presentation, replacing it with words like "confirm," "will cost," "FOB," and "will be shipped." *Id.* at 1369. In *Scaltech*, the proposal document in question recited the specific intended disposition of waste to be processed, the proposal stated the "quotation [was] for one centrifuge," and it stated "this offer is firm for 90 days." 269 F.3d at 1329.

The language here is not so aggressive. This case is more like *Linear Tech*, wherein the patent owner had disseminated "advertising materials and other information" and held a sales conference presenting the product. 275 F.3d at 1050. There, the Federal Circuit concluded, based on a factual record developed at a bench trial, that the patent owner had "designed [the materials] to be informational in nature and did not intend to use [them] to offer the [patented device] for sale." *Id.* In light of those findings, the Federal Circuit concluded that the conference and materials "did not make offers for sale but rather laid the necessary groundwork for *future* offers." *Id.* So too here.

This case has not proceeded far enough to perform the factual analysis affirmed in *Linear Tech*, but that simply means that it is premature to determine the legal effect of the DARPA presentation, placed before the Court only via judicial notice, without the benefit of discovery into its context.

Even if the DARPA presentation could be considered an offer, the record to date reasonably supports the inference that the subject of that offer was experimental, not commercial, in nature. Although *Pfaff* did not explain what was meant by its reference to a *commercial* offer for sale, it was careful to distinguish a sale that was "commercial rather than experimental in character." 525 U.S. at 312. The law is clear that an offer to engage in

experimental use of the invention "serves as a negation of the statutory bars." *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1348 (Fed. Cir. 2018) (citations and quotation marks omitted). A use is experimental if the goal is (1) to test claimed features of the invention or (2) to determine whether the invention will work for its intended purpose. *Id.* The Federal Circuit has identified thirteen factors that indicate whether a use was commercial or experimental:

> (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, (9) the degree of commercial exploitation during testing, (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

*Id.* at 1348–49 (quoting *Clock Spring, L.P., v. Wrapmaster, Inc.*, 560 F.3d 1317, 1327 (Fed. Cir. 2009)).

What Plaintiffs or DARPA each contemplated concerning those thirteen factors and how they would have manifested in an agreement between the parties based on the presentation alone is a complete mystery on this record. The mystery is compounded because the materials that Defendants submitted bear no indication of the protocol pursuant to which Mr. Kocher made this presentation to Dr. Morish. Even setting aside the regulatory hurdles, discussed *infra* Section I.B, we cannot purport to infer what the parties understood about each other's intent at the meeting, or whether either understood the other to be in a position to conclude a bargain.

That mystery undermines Defendants' position that the presentation was an offer at all, but it also further demonstrates that the legal impact of the DARPA presentation cannot be determined without the development of a full factual record. Indeed, the fact that DARPA is generally a research-funding organization and is not focused on procurement, *see* DARPA.mil, *About DARPA*, ("For sixty years, DARPA has held to a singular and enduring mission: to make

pivotal investments in breakthrough technologies for national security."),

https://www.darpa.mil/about-us/about-darpa, underscores the likelihood that if Mr. Kocher

sought any contractual relationship, it would have been experimental in nature. Mr. Kocher's

intent to pursue experimental endeavors, not commercial sales, is bolstered by the fact that he

ultimately negotiated a CRADA with ARL, which focused on developing and testing a follow-on

innovation after his proposed configuration was already a proven success.

Even if the Court could determine that the DARPA presentation was commercial and not

experimental and that it could have matured into a contract by simple acceptance by a general

commercial buyer, that would not be enough. The alleged prospective buyer here was the

government, not a general commercial purchaser, and the government is subject to considerable

regulations governing the evaluation of offers and the formation of contracts. This precludes a

finding that the DARPA presentation constituted an invalidating offer under the on-sale bar.

### B. DARPA Could not have Formed a Contract with I-3 Without Further Manifestation of Assent to Conclude a Bargain.

In assessing whether a contractual offer occurred, the UCC directs courts to consider

factors such as the prior course of dealing of the parties and the practice in the industry. UCC

§ 1-205. And the Federal Circuit has directed courts to consider those idiosyncrasies as part of

analyzing the applicability of the on-sale bar. In *Lack Industries, Inc. v. McKechnie Vehicle

Components USA, Inc.*, 322 F.3d 1335 (Fed. Cir. 2003), the existence of a contractual offer for

on-sale bar purposes could not be determined on the appellate record because there had been

insufficient fact-finding concerning the record evidence "about how sales are made in the

automotive industry." *Id.* at 1348. The Federal Circuit remanded and directed the district court

(or a special master involved in evaluating the issue) to make findings of fact regarding industry

practice and possibly to take additional evidence on point, concerning whether the conduct in

question rose to the level of an offer.  *Id.*; *see also Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 855 F.3d 1356, 1366 (Fed. Cir. 2017), *cert. granted*, 138 S. Ct. 2678 (2018) (noting "the absence of FDA approval may be a relevant consideration [in assessing whether a communication constituted an offer]"); *Fisher-Price, Inc. v. Safety 1st, Inc.*, 109 F. App'x 387, 392 (Fed. Cir. 2004) ("In sum, whether or not the alleged offer in this case rose to the level of a commercial offer for sale is a factual question to be judged in view of the circumstances surrounding its making, taking into account such factors as the status of negotiations, the language of the documents, the terms of any previous inquiry, and the prior course of dealings between the parties.").

Here, federal regulations govern not only the course of dealing between the parties but also the ability of DARPA to accept any offer posed by anyone in the industry.  A communication does not rise to the level of an offer if "the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."  *Linear Tech*, 275 F.3d at 1050 (quoting Restatement § 26).  Plainly, Dr. Morish would have been aware of the regulations governing his own contracting authority, and Mr. Kocher also had extensive experience in developing research proposals with the government.  Thus, Dr. Morish knew that Mr. Kocher could not have intended to conclude a bargain for the obvious reason that Dr. Morish and DARPA faced regulatory constraints on their own bargaining authority.  Notwithstanding the foregoing discussion showing that the DARPA presentation was not an offer at all, it also was not an offer that anyone at DARPA could accept, without further manifestation of assent from Mr. Kocher.

An agency's authority to enter a contract of sale is constrained by the Federal Acquisition Regulation ("FAR"),[3] which sets forth "uniform policies and procedures for acquisition by all executive agencies." FAR 1.101. The FAR defines "offer" as follows:

> "Offer" means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called "bids" or "sealed bids"; responses to requests for proposals (negotiation) are offers called "proposals"; however, responses to requests for quotations (simplified acquisition) are "quotations," not offers. For unsolicited proposals, see subpart 15.6.

FAR 2.101. Plainly, the DARPA presentation was not an "offer" within the meaning of the FAR, since it was not in response to any covered solicitation.

The FAR defines "unsolicited proposal" as:

> [A] written proposal for a new or innovative idea that is submitted to an agency on the initiative of the offeror for the purpose of obtaining a contract with the Government, and that is not in response to a request for proposals, [or other express Government-initiated solicitations].

*Id.*

The regulation governing unsolicited proposals expressly contemplates the possibility that the presentation would contain either a "proposed price" or a "total estimated cost," which the agency could use for "meaningful evaluation." FAR 15.605(c)(1). But agencies cannot simply accept a would-be contractor's proposed price.

The FAR mandates that all contracting officers procure supplies only "from responsible sources at fair and reasonable prices." FAR 15.402. Where, as here, a price is not based on competition, the government's price assessment may require gathering additional data, including data from the offeror. FAR 15.402(a)(2)(ii). Moreover, where, as here, the proposal being

---

[3] The FAR is codified at 48 C.F.R. §§ 1 et seq. This brief refers to FAR regulations as FAR [subpart number]. The subpart number corresponds to the number within Title 48 of the Code of Federal Regulations.

considered is grounded in a cost estimate, agencies are obligated to include a profit margin as part of their price negotiations. FAR 15.404-4. This requirement is in place in furtherance of the goal of ensuring that profit remains "a motivator of efficient and effective contract performance." FAR 15.404-4(a)(3). On the face of the pleadings and the DARPA presentation, it is impossible to know what kind of cost and pricing analysis DARPA would still need to have done in order to form a contract with Plaintiffs. This is a far cry from the "simple acceptance" contemplated by the on-sale bar.

Moreover, on the face of the DARPA presentation, it is unclear whether it even constitutes an unsolicited proposal. It lacks many of the basic characteristics of an unsolicited proposal, *see* FAR 15.605, and it bears no indication of the protocol in place when it was arranged and delivered. Indeed, the cover letter for the presentation as submitted to the PTO, described the presentation as a "briefing," not as a "proposal." Ex. 1 at 2. According to the cover letter, the proposal was "delivered with the understanding that any information from the presentation would be held in confidence and would not be disseminated to the public," yet the DARPA presentation never included the confidentiality language required for a confidential unsolicited proposal, pursuant to FAR 15.609.

Further still, even if DARPA *could* have formed a contract based on the presentation without further input from Plaintiffs, it remains the case that such a contract would likely have been experimental, not commercial in nature. Indeed, the FAR expressly identifies "research and development," not procurement, as the goal of an unsolicited proposal. FAR 15.603(a). "Commercial item offers" are expressly carved out of the scope of unsolicited proposals. FAR 15.603(b).

Defendants may argue that consideration of the factual and legal constraints applicable in the context of government contracting elevates form over substance or that such consideration revives the totality-of-the-circumstances test rejected in *Pfaff*. Not so. Not only is the consideration of the factual circumstances surrounding DARPA's ability to accept any purported offer consistent with the decisional law on point, as set forth above, such consideration accords with the stated goals of the on-sale bar.

The Supreme Court explained the goal of the on-sale bar, reciting Judge Learned Hand's formulation, as ensuring that an inventor cannot "exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly." *Pfaff*, 525 U.S. at 312 (quoting *Metallizing Eng'g. Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 520 (2d. Cir. 1946)). This guarantees, as Judge Hand continued, that the inventor "does not thereby extend the period of his monopoly." *Metallizing Engineering v. Kenyon*, 153 F.2d at 520. The Federal Circuit has further explained that the test set forth by *Pfaff* had the effect "to bring greater certainty to the analysis of the on-sale bar." *Group One*, 254 F.3d at 1047.

As explained above, if not as a matter of law at least as a reasonable inference from this preliminary record, Plaintiffs could not have extended the period of commercial exploitation of the inventions claimed by the patents in suit via the DARPA presentation, without further conduct on their own part. Moreover, to train focus on what constitutes an acceptable offer in the non-governmental context would introduce greater uncertainty and inefficiency into the mix. If non-governmental industry standards prevailed in all cases, to avoid the on-sale bar while gauging the government's interest in a project, an inventor of military technology, for example, would need to abide not only by the customs of the government-contracting industry (and the applicable regulations), but he or she would also need to filter any communications to ensure

they could not be viewed as rising to the level of an offer for sale in any *other* industry. The law cannot and should not require government contractors to jump through such hoops for appearance's sake, even as their conduct presents no possibility of commercially exploiting their invention beyond the term granted in any patents issued to them.

Defendants cite this Court's decision in *Sparton Corporation v. United States*, 89 Fed. Cl. 196 (2009), as an example of the application of the bare application of traditional commercial contract law to government contracting within the context of the on-sale bar. But that decision never addressed the question of whether the communication in question was an *offer*. Rather, the battleground was between the commercial versus experimental nature of a communication the Court found was "clearly" a definite offer. *Id.* at 213–14. *Sparton* is simply inapposite to the question posed here, regarding whether a communication is an offer where both indefinite language and regulatory constraints suggest it is not.

The Court should find that the DARPA presentation was too indefinite to constitute a commercial offer for sale and that regulatory constraints on DARPA's contract authority ensured that the communication could not have the legal effect of such an offer.

## II. THE CRADA DID NOT CONFER A LICENSE TO PRACTICE OR HAVE PRACTICED THE '648 OR '008 PATENTS ON THE GOVERNMENT.

Even as Defendants argue the inventions claimed in the patents in suit were ready for patenting as of the date of Mr. Kocher's presentation to DARPA, they contend Mr. Kocher actually invented them as part of his work several months later, as part of his cooperative research and development efforts with ARL. Defendants pivot to this alternative set of facts in an effort to bring Plaintiffs' inventions covered by the '648 and '008 patents within the scope of a license agreement in the CRADA governing Mr. Kocher's project with ARL. Their theory of dismissal fails in this parallel universe too.

*First*, the patents in suit, drawn to a novel configuration of armor, do not come within the scope of the CRADA's license agreement, which focused on the selection of the optimal armor technology and the integration of that armor into Mr. Kocher's pre-existing design (perhaps refined to receive the selected armor). *Second*, the reduction to practice of the patents in suit occurred prior to the effective date of the CRADA. Thus, Defendants' alleged license defense is misplaced.

A.    **The CRADA License Covered Inventions Relating to ARL's Armor Technology and Integration, Not Configuration.**

The CRADA provided for a license to certain inventions developed throughout the course of the project, as follows:

> Each Collaborator grants to the other Collaborator a nonexclusive, irrevocable, paid-up license to practice a Subject Invention Made by employees of the granting Collaborator or have the Subject Invention Practiced throughout the world by or on behalf of the other Collaborator.

CRADA, Art. 7.4.5.1.[4]

The CRADA defined the term "Subject Invention" to mean "any Invention Made in the performance of the Cooperative Work," *id.*, Art. 1.23, and it defined "Made" in that context to mean "the conception or first actual reduction to practice of such Invention," *id.*, Art. 1.15 (citing 15 U.S.C. § 3703(10), which sets forth the same definition).

Notwithstanding Defendants' admission that the inventions were ready for patenting before the CRADA was executed, they contend that the success of testing of prototype vehicles between March 5th and March 19th, 2007, as described in Paragraph 25 of the instant complaint, constituted the "first actual reduction to practice" of the invention claimed by the patents in suit. But nothing in Paragraph 25 indicates that particular demonstration constituted the first reduction

---

[4] Citations to the CRADA are to Ex. 2 of the Tamburo declaration.

to practice of the inventions *claimed in the patents in suit*.   All that allegation states is that the success of the demonstration was "[t]o the Government's astonishment."  Compl. ¶ 25.  Indeed, just three paragraphs earlier, the complaint notes that REF's testing of "Mr. Kocher's armor kits withstood the EFP munitions," which was also "to the Government's surprise," suggesting that Mr. Kocher had already proven the success of his configuration.  Compl. ¶ 22.

This distinction is significant.  CRADA's license agreement extended only to Subject Inventions, which are those inventions made "in the performance of the Cooperative Work." The CRADA defined "Cooperative Work" as follows:

> [R]esearch, development, engineering, or other tasks performed under this Agreement by ARL or I3 working individually or together, pursuant to the Objectives (Article 2) and the Statement of Work (Appendix A).

CRADA, Art. 1.5.

The patents in suit claim novel configurations of armor.  *See* '008 Patent (noting the invention's "very novel way" of modifying a vehicle:  "Instead of evenly protecting the interior of the vehicle with relatively thin armor or lower protection levels all around the cab of the vehicle, the HSUUV utilizes extremely thick side armor"); '648 Patent, 2:6–11 (same); Statement in Support of the United States' Motion to Issue Rule 14(b) Notices, Dkt. No. 17 at 2, noting that "[t]he patents-in-suit pertain to an armor 'configuration' for protecting military vehicles" (quoting Compl. ¶ 12)).  The goal of the CRADA was not to identify a working configuration of armor, but rather the selection and integration of ARL's particular armor technology into Mr. Kocher's already successful configuration:

> The program goal is to integrate ARL-designed armor(s) onto a vehicle being developed by Ideal Innovations Inc.  Ideal Innovations Inc. and ARL will mutually develop design constraints and choose the best available armor technology based on ARL data.  ARL will perform limited optimization of the design through computer simulations.  The final selected design will be tested by ARL to gain confidence in its performance.  Ideal Innovations Inc. will integrate

this design onto a vehicle platform. Ideal Innovations Inc. and ARL will work together to overcome armor integration issues if and when they arise.

CRADA, Art. 2 ("Objective").

The "Statement of Work" at Appendix A of the CRADA similarly shows without a doubt that the Cooperative Work covered by the CRADA would build on a pre-existing configuration. The Statement of Work directed I-3 and ARL (after they defined system constraints) to "down select armor technologies to investigate . . . ." CRADA, App'x. A. The Statement of Work contemplated that testing might commence on "an existing design," though the selection of armor technologies might "help refine a design." *Id.* The "best . . . successful design" resulting from this refinement process would be the one with the "lightest weight/smallest volume." *Id.* Nothing about the refinement would have reworked the configuration now described in the patents in suit; it would simply have selected the optimal ARL armor to use in Mr. Kocher's configuration.

The patented configurations constituted necessary *precursors* to—not part of—the objectives of the CRADA. That is, it is reasonable to infer at this preliminary stage that the first reduction to practice of the configuration was not done "pursuant to the Objectives . . . and the Statement of Work," as would be required to fall within the definition of a Subject Invention. Rather, reduction to practice of the patented configurations was antecedent to that pursuit.

Even if such an antecedent invention could somehow be brought within the scope of the CRADA's license agreement, it remains reasonable to infer that the first reduction to practice predated the CRADA.

**B. Mr. Kocher Reduced the Patented Inventions to Practice Prior to the CRADA's Effective Date.**

As discussed above, the Statement of Work contemplated integration of ARL's armor technology into Mr. Kocher's preexisting design. On that basis, it would be *unreasonable* to

conclude that ARL would undertake testing of its different armor on a configuration that had not been proven, as would need to be inferred, in order to bring the patented inventions within the license agreement in the CRADA.

On the contrary, it is reasonable to infer from the face of the CRADA and the allegations of the complaint that Mr. Kocher had actually reduced to practice the configurations claimed in the patents in suit prior to December 10, 2006, when he signed the CRADA, and that the demonstration in March 2007 exhibited the results of combining the patented invention with ARL's particular armor technology. The resolution of that factual question is inappropriate on a motion to dismiss, particularly where the question arises from the interpretation of a document submitted for judicial notice. Instead, that reasonable inference must be drawn in Plaintiffs' favor.

Moreover, December 10, 2006, is not the proper measuring date for a reduction to practice to fall within the Cooperative Work. December 10 is the date on which *Mr. Kocher* signed the agreement on behalf of I-3, but the signature of the representative for ARL bears no date at all:

For the U.S. Army Research Laboratory:

I, the undersigned, by 15 USC 3710a and ARL regulations, am duly authorized to bind the U.S. ARL to this Agreement and do so by affixing my signature hereto.

Entered into this _____ day of _____ 200___.

By: JOHN M. MILLER

Title: **Director**

ARL Organization: **US Army Research Laboratory**

CRADA, Art. 14 ("Signatures").

The government has contended in correspondence with Mr. Kocher that it signed the CRADA much later, on February 10, 2007, but evidence may show that ARL's signature happened even later than that. The CRADA's license agreement is limited to inventions performed "*under this Agreement*." CRADA, Art. 1.5 (emphasis added).[5] Plainly, reduction to practice of the inventions claimed in the patents in suit could not have occurred *under* the CRADA before the CRADA actually matured into an agreement—the date of ARL's signature.[6]

It is true, Defendants can be expected to note, that Article 7.5.4 of the CRADA provided space for I-3 to disclose its "Non-Subject Inventions Made prior to the Effective Date and pertinent to the Cooperative Work," and I-3 disclosed "none." CRADA, Art. 7.5.4. But the agreement never affirmatively required such disclosure and indeed expressly contemplated that the disclosure would be non-exhaustive. *Id.* (noting I-3's Non-Subject Inventions "include[d] but [were] not limited to" the disclosure). Nor are the terms "property" or "pertinent" defined anywhere in the Agreement, so it is far from clear that inventions outside the scope of the CRADA's objectives and that had not yet even been published in a patent application would have come within that provision. Accordingly, Article 7.5.4 is of no moment.

The inventions claimed in the asserted patents are not covered by the license agreement in the CRADA. They are out of scope and out of time.

---

[5] This constraint is imposed via nested definitions. The license grant covers only Subject Inventions, which are limited to those made "in the performance of the Cooperative Work," which in turn covers only "research, development, engineering, or other tasks performed under this Agreement." CRADA, Arts. 1.5 ("Cooperative Work"), 1.24 ("Subject Invention"), 7.4.5.1 ("Nonexclusive License Grant").

[6] The CRADA defines "Effective Date" as "the date of the last signature of the Collaborators executing this Agreement." CRADA, Art. 1.7.

**CONCLUSION**

For the foregoing reasons, the Motion to Dismiss should be denied.[7]


Dated:  December 7, 2018                          Respectfully submitted,

/s/John M. Caracappa
                                                  John M. Caracappa (Attorney of Record)
                                                  Steptoe & Johnson LLP
                                                  1330 Connecticut Ave, NW
                                                  Washington, DC 20036
                                                  Tel. 202 429 6267
                                                  Fax. 202 429 3902
                                                  jcaracappa@steptoe.com

                                                  *Counsel for IDEAL INNOVATIONS, INC.,*
                                                  *THE RIGHT PROBLEM, LLC, and*
                                                  *ROBERT KOCHER*

---

[7] Because Defendants' theories are based on documents with no grounding in the complaint, it was unnecessary to allege facts setting forth Plaintiffs' earlier reduction to practice of the configurations claimed in the patents.  *Kalos v. United States*, 368 F. App'x 127, 132 (Fed. Cir. 2010) (holding that even though the plaintiff failed to "supply supporting affidavits or correspondence with the complaint" that might have resolved factual issues raised by judicially noticed documents, "summary dismissal . . . is not the favored process"); *see also ABB Turbo Sys. AG v. Turbousa, Inc.*, 774 F.3d 979, 985 (Fed. Cir. 2014) ("[P]laintiffs are not required to negate an affirmative defense in their complaint." (citations and alterations omitted)).

In case the Court disagrees, Plaintiffs ask that any dismissal be with leave to amend the complaint to add allegations supporting an earlier reduction to practice of the patented inventions, including detailing the self-funded testing performed with REF in 2006.

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing via the Court's ECF system on December 7, 2018, thereby serving all counsel of record.

/s/John M. Caracappa
John M. Caracappa